SHAW, Respondent, vs. CRANDON STATE BANK and another, imp., Appellants.

*January 12—April 5, 1911.*

*Mortgage securing several notes: Priority of lien: Equities: Fiduciary relations: Constructive fraud: Officers of corporations: Banks and banking: Validity of acts: Ratification: Foreclosure: Judgment: Disposition of proceeds of sale: Appeal: Review: Findings of fact.*

1. Where a fiduciary acts, in the same transaction, both for himself and for those whom he represents, either as vendor and vendee, obligor and obligee, or releasor and releasee, his acts are voidable at the election of the persons whom he undertakes so to represent, and neither good faith nor fair purpose on his part,

nor valuable consideration paid out by him, will avail to support the transaction against such election.

2. But where the fiduciary deals in good faith with those whom he represents in that capacity, each acting for himself, and parts with a valuable and sufficient consideration, the transaction may sometimes be upheld notwithstanding the fiduciary relation.

3. A finding by the trial court that a fiduciary acted in good faith and was guilty of no actual fraud, is a finding of fact; but a finding, upon undisputed facts, that he was guilty of no constructive fraud, is a mere conclusion of law.

4. So, also, a finding upon undisputed facts that transactions by a fiduciary were ratified by those whom he represented, is a conclusion of law.

5. The president, vice-president, and cashier of a bank, being three of its four directors, were also members of a board of six directors of a manufacturing company, and the vice-president and assistant cashier of the bank were members of the finance committee of said company. The company owed the bank sums aggregating more than half the capital of the bank, partly secured on two tracts of land owned by the company by deeds to the bank and by a trusteeship in which the vice-president of the bank was trustee. ,Said vice-president individually loaned to the company a large sum of money, and with the other directors of the bank consented that the bank release to the company its existing securities, and that the company execute a mortgage by which said vice-president and also the president of the bank should have liens prior to that of the bank on all the property of the company, including that so released. *Held,* that the transaction so far as it concerned the released property is voidable at the election of the bank and cannot be upheld by proof of good faith or the payment of a valuable consideration by said vice-president to the company; but as to the other property, upon which the bank had no lien, the priority given by the mortgage in favor of the vice-president advancing the cash may be upheld upon proof of the good faith and honest purpose of the transaction.

6. The directors of the bank who were interested in the manufacturing company were not competent to ratify the transaction on behalf of the bank so far as the bank thereby released its prior securities and subordinated its lien under the mortgage to the liens of the other mortgagees.

7. No ratification of such priority of the liens of the other mortgagees over that of the bank can be inferred from a pleading.

on behalf of the bank seeking foreclosure of the mortgage but denying such priority.

8. Nor can ratification be predicated upon the fact that the money loaned to the manufacturing company by the vice-president of the bank was deposited in the company's checking account at the bank.

9. Where the respective holders of several notes secured by a single mortgage running to them jointly do not stand equal in equity with reference to the manner of acquisition of security or with reference to one another, the rule of *Wood v. Trask*, 7 Wis. 566, and other cases following that case, does not confer priority of lien upon the holder of the note first falling due.

10. Thus, in the case above stated, a claim of the president of the bank to priority of lien, on the ground that his note fell due before that of the bank, cannot be upheld where he advanced no money but merely guaranteed the payment of certain debts of the manufacturing company.

11. But, as between said president and the vice-president who advanced money to the company, their equities being otherwise equal, and the note of the vice-president by agreement falling due first, the latter may have priority under the rule above referred to.

12. Where one mortgage runs to the payees in three several notes secured thereby, and one of said payees advanced cash for his note, the second undertook to pay certain other notes of the mortgagor for his note, and the third secured a pre-existing indebtedness of the mortgagor by its note, and the mortgagor, by agreement to which the third payee was not a party, consented that the second might, instead of paying said other notes, guarantee payment thereof, and, acting thereon, the second payee did not pay said other notes, it was error to provide in the decree of foreclosure that the sheriff should deposit part of the proceeds of the sale with the clerk of the court, there to remain until said second payee should deposit with the clerk the notes of the mortgagor guaranteed by him, since this might tie up the proceeds of sale for an indefinite time.

13. Properly, under the circumstances stated, the second payee should be given a short time within which to pay and discharge said other notes of the mortgagor, and should have his proportion of the proceeds of sale only in case he did discharge said notes within such time.

14. The claim to priority of lien by a plaintiff in foreclosure may be contested on equitable grounds by a mortgagee whose debt is not due, as well as by one whose debt is due.

APPEALS from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Reversed.*

The defendant *Crandon State Bank* appealed from the whole of the judgment of foreclosure. The defendant *Keith* appealed from that portion of the judgment which gave plaintiff, *Shaw,* a priority over him, and also that portion which required him to deposit the notes therein mentioned as a condition of receiving any part of the proceeds of the foreclosure sale.

For the appellant *Crandon State Bank* there were briefs by *Henry Hay,* attorney, and *Goodrick & Goodrick,* of counsel, and oral argument by *Mr. Hay* and *Mr. E. J. Goodrick.*

For the appellant *Keith* there was a brief by *G. H. Dawson* and *Kreutzer, Bird, Rosenberry & Okoneski;* for *Mr. Keith* as respondent there was a separate brief by *Kreutzer, Bird, Rosenberry & Okoneski;* and the cause was argued orally by *C. B. Bird.*

For the respondent *Shaw* there was a brief by *Samuel Shaw,* in person, and a separate brief by *Barbers & Beglinger,* of counsel, and the cause was argued orally by *Mr. Shaw* and *Mr. Charles Barber.*

The following opinion was filed January 31, 1911:

TIMLIN, J. This is an action to foreclose a mortgage executed by the Crandon Manufacturing Company on December 9, 1907, to *Samuel Shaw, M. D. Keith,* and the *Crandon State Bank* jointly to secure three promissory notes bearing even date with said mortgage, one in the sum of $10,000 payable to *Samuel Shaw* and due one year after date, one in the sum of $8,000 payable to *M. D. Keith* and due two years after date, and one in the sum of $14,000 payable to the *Crandon State Bank* and due three years after date.

The respondent, *Samuel Shaw,* commenced this suit for foreclosure on December 31, 1908, claiming priority of lien under said mortgage because his note fell due first, and mak-

ing the mortgagor a defendant and *Keith* and the *Crandon State Bank* defendants as subsequent lienholders.    The mortgage contained a provision that in case of nonpayment of any sum of money, either principal, interest, insurance premiums, or taxes, etc., the whole amount secured by the mortgage should, at the option of *Shaw, Keith,* and the *Crandon State Bank,* their representatives or assigns, to be exercised at the time of such default or any time thereafter, be deemed to have become due, etc.    Purporting to act under this power, *Keith* and the *Crandon State Bank,* because of interest in default upon each of their respective notes, each served a notice in writing of option to declare the whole sum secured by said mortgage due and payable.    *Keith* and the bank each answered *Shaw's* complaint, denying his claim to priority of lien and counterclaiming for foreclosure, *Keith* claiming a *pro rata* distribution of the proceeds of sale of the mortgaged property and the bank claiming priority of lien over *Shaw.* The circuit judge gave judgment of foreclosure and sale, but giving the plaintiff, *Shaw,* priority of payment out of the proceeds of such sale to the amount of his said note, interest, and costs.

The mortgagor, Crandon Manufacturing Company, is a corporation organized in the year 1903, situate and doing business at Crandon in Forest county in this state, and engaged in manufacture.    It had a board of six directors, among whom were *Keith, Shaw,* and Haile.    It had an authorized capital of 400 shares of $100 each, of which only 270 shares had been issued, and its officers were P. Shay president and W. W. Waite secretary.    Shay did not reside at Crandon or administer the business of the corporation. It had a finance committee consisting of *Samuel Shaw,* W. W. Waite, and Almon Smith.    On the day on which the mortgage was given it owed the *Crandon State Bank* $14,000, evidenced by notes, and had an overdraft in said bank of $2,248.43.    It also owed $6,000 on notes to the First Na-

tional Bank of New London, of which bank *Keith* was president, and $1,500 to the Allenton State Bank on a note, and $500 to one Tiernan, also evidenced by a note. The trial court found that the manufacturing company was not then insolvent, but the undisputed evidence shows that it was insolvent in the sense that it could not meet its liabilities in the ordinary course of business as they matured, but perhaps not insolvent in the sense that all its assets at a fair market value would not equal its liabilities to creditors, and the undisputed evidence shows that it was in a precarious financial condition.

The *Crandon State Bank* was organized in the year 1903 as a banking corporation under the laws of Wisconsin, situated and doing business at Crandon, with an authorized capital of $25,000, and at the time of making the mortgage in question. it had four directors. Said *Keith* was a stockholder, director, and president of this bank; Haile was a director and the cashier of the bank; *Samuel Shaw* was director and vice-president of the bank; and Almon Smith was assistant cashier. The other bank director was a traveling man named Crabtree, who took little part in the proceedings relative to the taking of the mortgage. The plaintiff, *Shaw*, was an attorney and drew up or dictated the papers and resolutions relative to the mortgage and notes in question as well as the mortgage and notes. The bank president, *Keith*, testifies that *Shaw* in doing so was acting as attorney for the bank and that he relied on *Shaw*. This is denied by *Shaw*, and the court finds that in doing so *Shaw* did not attempt or pretend to act as attorney for the bank. *Shaw's* interest, together with that of his wife and daughter, in the bank amounted to fifty shares out of 250 shares, and his like interest in the manufacturing company amounted to forty shares out of 270 shares. The bank was not represented by attorney or by any person not interested in the manufacturing company. The bank held as security for this indebtedness a deed of about four acres of land in the city of Crandon worth

about $2,500, and a deed from F. W. Marquardt and wife of land known as the "Marquardt eighty" suitable for platting and worth about $5,000.   August 18, 1906, the directors of the manufacturing company "resolved that as there was no record made upon the minutes as to the deeding of the Marquardt eighty to the *Crandon State Bank,* said deed was not legal because not authorized; resolved that said *Crandon State Bank* re-deed said eighty acres of land to the Crandon Manufacturing Company, and that *Samuel Shaw* be appointed trustee and receive all moneys and securities taken in from the sale of lots, blocks, and outlots in the Marquardt eighty, and turn the same over to the *Crandon State Bank* toward the liquidation of the debts of said Crandon Manufacturing Company to the *Crandon State Bank.*"   On the same day the directors of the *Crandon State Bank* held a meeting at which there were present directors *Keith, Shaw,* Crabtree, and Haile.

"It was moved by *Mr. Shaw* and seconded by Mr. Crabtree and duly carried that the Marquardt eighty, the title of which rested in the *Crandon State Bank* as security for loans, be transferred to the Crandon Manufacturing Company."

The land was platted, and *Shaw* accepted the trust because he reported sales as trustee, his last report being December 16, 1907, a week after the giving of the mortgage in question, on which date the record book of the manufacturing company shows the following:

"*Samuel Shaw,* trustee, reports the sale by C. H. Weast as agent of lots 3 and 4 of block 9 of Page's addition to Crandon, for $160, of which $50 has been paid, Weast reserving $8 of same for his commission, and *Samuel Shaw* having turned over the balance of $40 to the treasurer of said Crandon Manufacturing Company, said trustee also reports that no other sale of the real estate of the company has been made since his last report."

This treasurer of the Crandon Manufacturing Company, it will be remembered, was also cashier of the bank.   The mort-

gage in question covers these two pieces of property, although the title to the four-acre tract remained in the bank.

It thus appears that the affairs of the bank were thoroughly in the hands and under the control of the directors and officers of the manufacturing company, and the affairs of the manufacturing company were to the same extent under the control of the directors and officers of the bank. And the admission of the plaintiff, *Shaw,* in a letter written after his note became due is fully justified by the undisputed facts: "The management is substantially the same thing as that which we have in the bank, that is the controlling influence in the management." At a stockholders' meeting of the manufacturing company on December 7, 1907, the following resolution was unanimously adopted:

"Resolved by the stockholders of the Crandon Manufacturing Company that the board of directors are hereby authorized and empowered to mortgage all the real property of said Crandon Manufacturing Company to the amount of $32,000, bearing seven per cent. interest per annum, payable annually, $10,000 of such sum to become due and payable on or before one year from date, $8,000 of such sum to become due and payable on or before two years from date, and $14,000 to become due and payable on or before three years from date hereof, and to authorize and empower said board of directors to execute and deliver with said mortgage promissory notes of even date with the mortgage aggregating in amount the said sum of $32,000 and conforming as to rate of interest and time of maturity, and any other matter stated, to the conditions above set forth, the proceeds of said mortgage and promissory notes to be used by said board of directors in paying the present indebtedness of said Crandon Manufacturing Company and paying for stock to be manufactured into hubs and heading during the year 1908."

The directors of this company on December 9, 1907,

"Resolved that the board of directors of the Crandon Manufacturing Company do exercise and use the power vested in them by the stockholders of said company at a legal meeting

of the same, held on December 7, 1907, and do mortgage the real estate and appurtenances of said company as follows:

"Said mortgage shall be a first mortgage on said property in the sum of $32,000, and three several notes shall be executed and delivered with said mortgage as follows: A note payable on or before one year from date, to be called note No. 1, to *Samuel Shaw* in the sum of $10,000, and said sum to be advanced to the secretary of this corporation as called for on the written order of said secretary and the president or vice-president of this corporation, and such moneys to be used to purchase stock for this corporation to be manufactured in the year 1908. A note payable on or before two years from date, to be called No. 2, to *M. D. Keith,* and a note payable three years from date, called No. 3, to *Crandon State Bank,* No. 2 to be in the sum of $8,000 and No. 3 in the sum of $14,000, said notes Nos. 2 and 3 being executed to pay up and extinguish indebtedness of this corporation, all of said notes to bear seven per cent. interest, payable annually, and the president and secretary of this corporation are hereby authorized, empowered and instructed to execute and deliver said notes, and to execute, acknowledge and deliver said mortgage, as above set forth, said notes and mortgage to bear even date herewith."

The directors present at this meeting were *Keith, Shaw,* Haile, Gifford, Waite, and Shay. The mortgage and notes were accordingly executed and delivered, the mortgage to Smith, assistant cashier of the bank, and each note to the payee named therein. The notes aggregating $14,000 held by the bank were surrendered and delivered up to the manufacturing company and the back interest on the same adjusted, and thereafter this note of $14,000 was entered on the books of the bank as part of its bills receivable and continued as such. *Shaw* knew at the time of taking his mortgage that the manufacturing company, outside of his loan, owed at least $22,000 bills payable. Indeed the very mortgage to which he was a party informed him of this, but he had other means of knowledge also. The overdrafts of the manu-

facturing company in its checking account at the bank are considered relevant because it is said that *Shaw's* money was applied on these overdrafts. In the meeting of November 29, 1907, when the mortgage in question and the loan from *Shaw* were discussed, *Shaw,* in anticipation of the receipt of this note and mortgage, agreed to and on the next day advanced to the manufacturing company $1,500, which the manufacturing company deposited in its bank account, thus reducing its overdraft to that extent and leaving less than $1,000 overdraft. On December 9th *Shaw* advanced $2,000 more, which the manufacturing company also deposited in its bank account, and in the same way on December 31st $3,000, on January 1, 1908, $1,000, and on February 15, 1908, $2,500. The manufacturing company was continually drawing checks on this account, and the second payment by *Shaw* left the manufacturing company a credit in this account, but the same men were managing the affairs of both sides and authorizing and drawing checks against this account, and the mere fact that the instalments paid in by *Shaw* on his loan were deposited in the checking account of the manufacturing company at the bank has no particular legal significance. Sixty-six days after giving the mortgage and on February 15, 1908, the directors of the manufacturing company passed a resolution to shut down unless business is taken to warrant further running of the mill, and also to notify all parties who were hauling timber to the manufacturing company not to cut any more stock. Some time later the manufacturing company suspended operations with a considerable amount of raw material on hand which was worked up and sold and the proceeds used in paying operating expenses and debts incurred after the giving of the mortgage in suit. The manufacturing company is now doubtless insolvent.

Parol evidence is offered by *Shaw* to show an oral agreement that he was to have priority of payment, and on the part of *Keith* to show an oral agreement that the three notes

should prorate in the mortgage security. The court, however, excluded this last parol evidence as tending to modify or contradict the legal effect of the writings. The mortgage contained a recital that

"Said notes Nos. 2 and 3 being given to extinguish and pay in full the present indebtedness of the said Crandon Manufacturing Company."

On January 17, 1908, the stockholders of the manufacturing company in meeting "Resolved that note No. 2, given to *M. D. Keith* on December 9, 1907, with the first mortgage on the property of this company, has been so given to him with the express understanding and agreement on his part that he has received the same to protect this company from outstanding indebtedness in notes to the amount of $8,000." *Keith* never paid or discharged any of these notes, although he contends he made himself liable for payment thereof by all the writings hereinbefore referred to and by oral statement to some or all of the holders of the notes. After the taking of said mortgage a controlling interest in the shares of stock of the bank passed to purchasers not interested in the manufacturing company, and the *State Bank* was furnished with new or additional capital and organized as a national bank. The persons interested in the manufacturing company did not at any time own all the stock of the *Crandon State Bank.* The circuit court also found that the manufacturing company would have been unable to secure material with which to operate or to borrow money had not *Shaw* advanced this $10,000; "that the loan of *Shaw* to the manufacturing company was made at the earnest solicitation of both officers of the bank and of the manufacturing company . . . and upon the express promise and expectation that the same would be repaid promptly when due . . . and that other persons interested in the bank and manufacturing company would help the situation and lend the company financial aid. That the transaction was in all respects a fair one and was thought to

be at the time by all concerned and was in fact for the best interests both of the bank and of the manufacturing company, and that a failure of the manufacturing company would have seriously affected and impaired the credit of the bank. That the said plaintiff, *Shaw,* was guilty of no violation of trust and was guilty of no fraud, actual or constructive." "That *Shaw* and his family ceased to be stockholders of the bank in September, 1908, when his interests were taken by the new stockholders." "The new stockholders were fully informed of the default on the mortgage and of the existence of the mortgage and of the value of the properties and generally of all the material facts."

"That with full knowledge of all the facts necessary to protect any of its rights in the matter the said bank has deliberately and unqualifiedly ratified, confirmed and affirmed the transaction and all of it. That at no time has the bank offered or placed any of the parties *in statu quo.* That it has from the outset accepted the mortgage and notes as given, received the benefits of the transaction, and in this action has asked a foreclosure of the same. It is found that the bank fully and completely ratified the transaction, and especially the making and giving of the mortgage, and has always intended to rely upon and take the benefits thereof."

These findings of fact put the case in the strongest light for the plaintiff, *Shaw.* So far as they find the good faith of *Mr. Shaw,* the distress of the manufacturing company, the good intentions in his loan to the company, and that *Shaw* was guilty of no fraud, they are supported by evidence and must stand. But the finding that *Shaw* was guilty of no constructive fraud is not a finding of fact but a conclusion of law drawn from undisputed facts. The same is true of the finding that the bank ratified and confirmed the transaction. The only ratification of the bank is either through *Shaw* and his associate directors who were interested in the manufacturing company, or by a counterclaim for foreclosure of the

mortgage herein, or by permitting the manufacturing company to deposit in its checking account with the bank the money received from *Shaw*. This is no ratification, because the directors were incompetent to ratify it; because the counterclaim for foreclosure challenges *Shaw's* priority instead of approving it; and because a deposit by the manufacturing company of the proceeds of the loan from *Shaw* in its checking account with the bank is in no sense a ratification of *Shaw's* priority. *Shaw* was interested in the manufacturing company and a director thereof interested in its prosperity, a director of and interested in the prosperity of the bank, and also interested in the prosperity of the village of Crandon as a real-estate dealer and property holder. He advanced his money as a loan to his own corporation, the manufacturing company, under the expectation that he would be paid out of the proceeds of the operation of the mill upon the raw material purchased with the avails of his loan, and took the mortgage as security, and we may assume that he had the welfare of the bank in mind, but as things turned out he was mistaken; his loan brought no profit to the manufacturing company wherewith to pay him or to pay the bank or to pay any of the debts of the manufacturing company outstanding at the time he made his loan.

Upon this showing a decree of foreclosure and sale was entered giving *Shaw* priority of lien on all the property covered by the mortgage and in the proceeds of the sale of this property. It was also provided that *Keith* was entitled to judgment of foreclosure with costs, but no payment of the proceeds of foreclosure should be made to *Keith* except on condition that he deposit with the clerk of the court the $8,000 of notes of the manufacturing company assumed and guaranteed by him, and that until such condition is complied with the sheriff deposit the amount of such money with the clerk of the court. Subject to the prior lien of *Shaw*,

*Keith* and the bank prorate in the surplus, if any, received from the foreclosure sale after *Shaw* has been paid in full with interest and costs.

The decree rests upon *Wood v. Trask,* 7 Wis. 566; *Marine Bank v. International Bank,* 9 Wis. 57; *Lyman v. Smith,* 21 Wis. 674; *Pierce v. Shaw,* 51 Wis. 316, 8 N. W. 209; *Mc-Lean v. Hoehle,* 98 Wis. 359, 74 N. W. 120. In each of the cases above quoted the rule that where several notes falling due at different times are secured by the same mortgage that which falls due first is entitled to priority in the security is stated with the qualification that this is a general rule which must prevail unless some special equity intervenes to give a precedence to some other claim. In *Marine Bank v. International Bank, supra,* the court said:

"We were well aware that in some of our sister states a contrary doctrine had obtained, and that it had been held that the fund arising from the sale of mortgaged premises, in case of a deficiency, should be ratably applied among the holders of the different notes or instruments; but when no special equities intervened to vary the rule, we thought the note or instrument first becoming due was entitled to priority in payment. And, without enlarging upon the reasons that led us to this conclusion, it appeared to us that this priority must exist, under our statute, as the notes were the principal and the mortgage but an accessory, and the holder of the first note, upon default in its payment, had the right to commence his action, and subject the mortgaged premises to foreclosure and sale for the satisfaction of his debt. It seemed to us, therefore, that the maxim of *prior in tempore, potior in jure,* rightly applied, in the absence of all equitable considerations between the assignors and assignees, to change this rule, or principle of law." See, also, 1 Pom. Eq. Jur. § 414.

This rule applies only where the parties owning the respective notes stand equal in equity with reference to the manner of acquisition of security and with reference to one another. Trustees or fiduciaries acting for others and in the same transactions for themselves; consenting for the bank

to release its existing securities and put the property on which these securities rested into a common group with other property of the mortgagor, covering this common group of property by a mortgage running to the directors and to the bank jointly, and at the same time consenting for the mortgagor to make the notes secured by the same mortgage payable in such order that the notes given to the fiduciaries come due first and that of the beneficiary last, and consenting for themselves to thus take priority and for their beneficiary to thus give them priority over that beneficiary, cannot hold priority under the rule of the cases cited. *Mr. Shaw* as director of the bank and director of the manufacturing company occupied a fiduciary relation to each of these corporations. He also was trustee of an express trust with reference to the Marquardt tract. The mortgage covered this tract and the four-acre tract upon which the bank had a prior security, and the legal effect now claimed by *Shaw* and given him by the decree below of the mortgage is to release the security of the bank on this four-acre tract and to release *Mr. Shaw's* trusteeship on the Marquardt tract and put *Mr. Shaw's* loan in as a prior lien on both. It is immaterial whether the security of the bank on the Marquardt tract was valid or invalid as to other creditors. It is the relation of *Mr. Shaw* to that security rather than the validity of the security which determines the question here.

The circuit court as to these two tracts on which the bank had security applied the wrong rule, as shown by 2 Pom. Eq. Jur. § 957, where two classes of cases are recognized: one where the fiduciary is dealing with his beneficiary, each contracting for himself; the other where the fiduciary in the transaction as representative of his beneficiary contracts or deals with himself in his personal or individual capacity, thus being both vendor and vendee, obligor and obligee, releasor and releasee. In the first class of cases the transaction may sometimes be upheld upon a showing of good faith,

valuable consideration, and that the transaction was not inequitable.    In the second class of cases this showing will not avail.

"The second class includes all those instances in which one party, purporting to act in his fiduciary character, deals with himself in his private and personal character, without the knowledge of his beneficiary, as where a trustee or agent to sell sells the property to himself.    Such transactions are voidable at the suit of the beneficiary, and not merely presumptively or *prima facie* invalid. . . . The circumstances show that there could not possibly be the good faith, knowledge, and free consent required by the principle, and therefore the result which is a rebuttable presumption in the first class of transactions becomes a conclusive presumption in the second." 2 Pom. Eq. Jur. § 957.

This is the rule in Wisconsin, as shown by the *Taylor Orphan Asylum Case*, 36 Wis. 534, and *Cook v. Berlin W. M. Co.* 43 Wis. 433.    As was said in *Hutson v. Jenson*, 110 Wis. 26 (85 N. W. 689), at page 40:

"The rule of these cases is that no dealing by one in fiduciary capacity with himself individually can prejudicially change the situation of the beneficiaries or their property. The application of this rule is not dependent upon the existence either of fraud or mismanagement; for its foundation is in a sound public policy, which would exclude all necessity of investigation of either the honesty or the wisdom of such dealings in a dual capacity."

The effect of the findings and decree is that a fiduciary and trustee acting with other disqualified fiduciaries may take property upon which their beneficiaries had security, turn it back to the debtor corporation which they also control, and then take a mortgage on all the property of the latter corporation, including the property so turned back, and make the several notes secured by this mortgage due at such times that the trustee's note will first fall due, and so obtain priority of lien on the property returned to the debtor by them acting for their beneficiary.    This cannot be done.    Neither good faith

nor benevolent purposes, nor acquiescence by the bank while under their control, nor the attempted foreclosure of the mortgage by the bank (the bank in such foreclosure claiming priority), will avail to prevent the bank reasserting as against such fiduciary its prior lien on the property which it once held as security. Public policy forbids us to uphold any such decree if we were otherwise disposed to do so. But the rule is a salutary one and should be strictly adhered to under all circumstances. It will not do for a fiduciary, who in contracting acts for himself and for his beneficiary, to escape the invalid consequences of such act by mere proof that he acted in good faith and paid a valuable consideration. The decree cannot be supported on the ground that *Mr. Shaw* paid in cash while the other parties merely secured pre-existing debts. He paid in cash to his own manufacturing company and not to the bank. And he was obliged to consent for the bank, both that the bank release its prior securities and that the bank accept the third note or the note last due. He was aided in this by the other officers of the bank sustaining the same relation to both corporations that *Shaw* did. His money, while it might improve the chances of the mortgagor to pay out of its business operations, brought in no security under the mortgage. Further, the transaction on the part of *Shaw* not only subordinated the bank to *Shaw's* lien and took from the bank security it already possessed, but also attempted to postpone the bank to *Keith's* lien under the mortgage. *Keith* also consented to the release by the bank of the securities and that they be thrown into a common fund with other property of the mortgagor and this all covered by a new mortgage in which he or the other bank in which he was interested should have priority over the *Crandon State Bank* by reason of *Keith's* note coming due before that of the *Crandon Bank*. *Shaw* consented to this and *Keith* consented to it. *Keith* did not pay up the notes of $8,000, as it was first intended he should, and the directors of the manufacturing com-

pany appear to have later consented that he need not, but merely save the manufacturing company harmless thereon. This could not affect the bank. As to the bank, he has not paid as he agreed to in the mortgage in which he and the bank and *Shaw* were mortgagees. With reference to this four-acre tract and the Marquardt eighty, *Shaw* and *Keith* are equal in their disabilities, equal in equities or in lack of equity. *Shaw* put in cash; *Keith* did not. *Shaw's* note falls due before *Keith's*. *Keith* has no equity to displace the priority which *Shaw* would have from this circumstance alone. Rather the contrary. Therefore in the four-acre tract and in the Marquardt eighty the order of priority will be first the *Crandon State Bank,* second *Shaw,* and third *Keith.*

With reference to the remainder of the mortgaged property the case rests upon different rules of law. Upon this the bank had no security prior to the making of the mortgage in question. The bank paid out nothing and parted with nothing. It received only the additional security furnished by the third note secured by this mortgage. There was no consent necessary on the part of the bank except the consent to receive the new security. This the directors were not so absolutely disqualified to give. The rule resting in public policy hereinbefore applied did not obtain because there was no contractual relation by which the disqualified directors represented the bank in parting with anything or in undertaking any obligation. They were not as to this on both sides of the transaction, buyer and seller. Nevertheless they were fiduciaries and disqualified to obtain any advantage over their beneficiary. But the disqualification as stated was not so absolute. The transaction might be supported in equity if made in absolute good faith and apparently for the best interests of the bank as it appeared at the time and to induce *Mr. Shaw* to part with his $10,000. On this branch of the case the findings of the court herein referred to establishing the good faith

and fair purposes of *Mr. Shaw* and the manner in which he parted with his cash have great force and significance. So far as the manufacturing company is concerned he in effect made it a condition of loaning this $10,000 to it that he should be first paid and have priority, according to the findings of the court. The pre-existing debt to the bank was not increased. Of the three persons secured by the mortgage *Shaw* was the only one who paid money to the mortgagor for his note. The other two, the *Crandon State Bank* and *Mr. Keith*, merely had secured to them, as the thing turned out, existing claims against the manufacturing company. It appeared to all concerned, according to the findings, that this disposition and this mode of security was for the best interests of the manufacturing company and its creditors, including the *Crandon State Bank*. It placed the *Crandon State Bank* in no worse position than it was before the mortgage was made and might have bettered its condition. According to the findings *Mr. Keith* agreed that *Mr. Shaw's* notes should come due first, and as to this part of the mortgaged property he, to say the least, has no superior equity to displace the priority which the law would give to *Shaw* under such circumstances. If the *Crandon State Bank* had prayed that its lien on this remainder of the mortgaged property be declared paramount to that of *Keith*, the bank would be entitled to such relief. That part of the decree which provides that the sheriff shall deposit part of the proceeds of the sale with the clerk of the court, there to remain until *Mr. Keith* deposit with the said clerk the $8,000 of notes of the Crandon Manufacturing Company assumed and guaranteed by him, cannot be approved. This might tie up that money for an indefinite time. That should be changed so that *Mr. Keith* should be given a short time, say sixty days, within which to pay up those notes and make a supplemental report to the court, filing the paid and discharged notes therewith, and in default of his so doing that he have no part of the proceeds of sale. But

subject to this requirement the order of priority in this re-
mainder of the mortgaged premises should be first *Shaw,* sec-
ond the *Crandon State Bank* in the event that *Keith* does not
pay up the notes.    But in the event that *Keith* pay up these
notes and make proof thereof as aforesaid the priority should
be first *Shaw,* second the *Crandon State Bank* and *Keith pro
rata* on the original amounts awarded by the decree appealed
from, as asked in the pleading of the bank, until their re-
spective claims are discharged and paid, the surplus, if any,
to be brought into court.    The validity of the notices of op-
tion served by the bank and by *Keith* declaring the whole
amount due is a matter of no concern here.    Their attempt to
foreclose their interest in the mortgage is a matter of no es-
toppel.    The plaintiff comes into court claiming priority.
The bank and *Keith* have conceded liens due or not due and
deny his priority.    They may as effectually contest *Shaw's*
claim to priority upon liens securing sums not due as upon
liens securing sums due.    The manufacturing company hav-
ing defaulted, the sums secured by the liens may be all con-
sidered due for the purpose of foreclosure and sale except in
the case of *Keith.*    No sum will be due to him unless and
until he discharges the notes to the amount of $8,000 to se-
cure payment or discharge of which his interest in the mort-
gage was given by the manufacturing company.

The decree of the circuit court must be reversed, and the
cause remanded with directions to enter a decree in accord-
ance with this opinion.

*By the Court.*—It is so ordered.

A motion for a rehearing was denied April 5, 1911.