IN RE BEAVER DRAINAGE DISTRICT: ROSE and others, Appellants, vs. AMERICAN NATIONAL BANK OF BEAVER DAM, Respondent.*

*January 19—February 15, 1944.*

* Motion for rehearing denied, without costs, on Apirl 24, 1944.

605

606

For the appellants the cause was submitted on the brief of *Donovan, Gleiss & Goodman* of Tomah, attorneys for Fred Erbes, and by *H. A. Rose* and *McCaul & McCaul* all of Tomah, attorneys for commissioners of Beaver Drainage District.

For the respondent there was a brief by *Masters & Hansen* of Sparta, attorneys, and *Theo. W. Brazeau* of Wisconsin Rapids of counsel, and oral argument by *Mr. Brazeau.*

ROSENBERRY, C. J.    Upon this appeal petitioners contend that, (1) the holders of the first issue of drainage bonds by accepting refunding bonds in lieu thereof did not lose the lien of the first issue in the absence of an express agreement creating a novation; (2) where the taxing power of a drainage district has been exhausted and the district has insufficient funds to pay the existing bonds in full, the fund should be prorated; (3) that under the circumstances of this case the statute of limitations did not begin to run until the trust was repudiated.

Petitioners invoke the doctrine well established in this state that a renewal by the giving of a new note or the extension of time in which to pay a pre-existing debt is not a discharge of the old and original obligation and the creation of a new obligation, but a mere carrying on of the prior obligation, unless and except it appears that the parties agreed that it should be a destruction of the old and the creation of a new obligation. Citing *Wisconsin Trust Co. v. Cousins* (1920), 172 Wis. 486,

179 N. W. 801; *Rosendale State Bank v. Holland* (1928), 195 Wis. 131, 217 N. W. 645.

The question is whether the principle invoked is applicable to the facts of this case. The first issue of bonds was dated March 1, 1905, and the bonds were issued pursuant to the provisions of sec. 1379—25, Stats. 1898, which provided:

"The commissioners may borrow money, not exceeding the amount of assessments unpaid at the time of borrowing, for the construction of any work which they shall be authorized to construct or for the payment of any indebtedness they may have lawfully incurred, and may secure the same by notes or bonds bearing interest at a rate not to exceed six per cent per annum, and not running beyond one year after the last assessment on account of which the money is borrowed shall fall due; which notes or bonds shall not be held to make the commissioners personally liable but shall constitute a lien upon the assessments for the repayment of the principal and interest of such notes or bonds; and the court may, on the petition of the commissioners, authorize them to refund any lawful indebtedness of the district by taking up and canceling all its outstanding notes and bonds as fast as they become due or before, if the holders thereof will surrender the same, and issue in lieu thereof new notes or bonds of such district payable on such longer time as the court shall deem proper, not to exceed in the aggregate the amount of all notes and bonds of the district then outstanding and the unpaid accrued interest thereon. . . ."

As already stated, the district having defaulted in the payment of bonds of the first issue, all unpaid bonds of that issue were ordered refunded under the provisions of subs. 6 and 7 of sec. 1379—31*b,* Stats. 1921. Subs. 6 and 7 are as follows:

"6. The court may on the petition of the commissioners or of the holder of any bond, interest coupon or other district obligation authorize the commissioners to refund any lawful indebtedness of the district by taking up and canceling any or all of its outstanding notes and bonds as fast as they become due (or before they are due if the holders thereof will sur-

render the same) and issue in lieu thereof new notes or bonds of such district payable in such longer time as the court shall deem proper, not to exceed in the aggregate the amount of all notes and bonds of the district then outstanding and the unpaid accrued interest thereon, and bearing interest not to exceed six per centum per annum.

"7. When the indebtedness of the district has been refunded or is about to be refunded, as provided above, the court may on petition of one or more landowners, or of the commissioners, extend the time in which to pay assessments for construction to September first next before a like portion of the refunding bonds, which are liens thereon, become due, in which event the face of all unpaid past-due assessments so extended together with all interest, penalties and charges shall be a lien on the lands against which the assessments were originally made, and the court may make all orders and do all other things necessary to carry into effect such extension of time."

So far as the applicable provisions are concerned this statute is in substance the same as the statute under which the bonds were issued. For that reason we do not need to consider whether the legislature had power to compel the holders of bonds of the first issue to accept refunding bonds. The legislature did not attempt anything of that kind.

While the statute as it stood in 1905 made the bonds so issued a lien upon the assessments, this court held in *In re Dancy Drainage District* (1927), 193 Wis. 118, 122, 213 N. W. 885, that the bonds so issued were—

"a lien upon the entire assessment of benefits and that the holders of such obligations had pledged to them as their security the lands in the district to the extent of the assessment of benefits, it was necessarily a determination and holding that the holders of the first issue of obligations, having had such security pledged to them, were necessarily holders of a paramount right to such security. The full extent of such security being thus pledged, such paramount security could not be altered or lessened by subsequent proceedings or by subsequent issue of other obligations by the district without the consent of the holders of such first issue."

It appears from the findings in this case that prior to the issue of the refunding bonds there were, including the first issue, five issues of bonds. The portions of these various issues remaining unpaid were refunded by the refunding bonds dated July 1, 1921. Attention is directed to sec. 1379—31*b*, 7, Stats. 1921, already quoted, which provides in case of the issue of refunding bonds, for an extension of all unpaid past-due assessments to September 1st next before a like portion of the refunding bonds become due. In this case the time of payment of past-due assessments was extended in accordance with the terms of the statute. The effect of subs. 6 and 7 is to make the refunding operations a mere extension of the time within which the original obligation was to be paid.

Under these facts the question for decision is, What effect did the issuance to and acceptance of refunding bonds by a holder of bonds of the first issue have upon the lien upon the assessment for benefits given by statute? In the solution of this question we are without a guide except such general principles as have been developed relating to securities in other fields.

In accordance with the decision in *In re Dancy Drainage District, supra,* already referred to, the holders of the outstanding bonds at the time the refunding issue of 1921 was issued had liens upon the assessment for benefits, the holders of the first issue a first lien, the holders of the second issue a second lien, and so on. The bonds of the first issue were not secured ratably by the terms of the bond. They were straight obligations to pay principal and interest at the times specified in each of the several bonds. Nor did the statute contain any provision with reference to the rights of the holders of the respective maturities of bonds. The state is strongly committed to the proposition that, where several notes falling due at different times are secured by the same mortgage, equity requires their payment in the order of their maturity out of

the property on which they are secured unless some special equity intervenes to require a different direction. *Wood v. Trask* (1859), 7 Wis. *566.

In *Marine Bank v. International Bank* (1859), 9 Wis. *57, *65, in commenting on *Wood v. Trask, supra,* the court said:

"We were well aware that in some of our sister states, a contrary doctrine had obtained, and that it had been held that the fund arising from the sale of mortgaged premises, in case of a deficiency, should be ratably applied among the holders of the different notes or instruments; but when no special equities intervened to vary the rule, we thought the note or instrument first becoming due, was entitled to priority in payment. And, without enlarging upon the reasons that led us to this conclusion, it appeared to us that this priority must exist, under our statute, as the notes were the principal and the mortgage but an accessory, and the holder of the first note, upon default in its payment, had the right to commence his action, and subject the mortgaged premises to foreclosure and sale for the satisfaction of his debt. It seemed to us, therefore, that the maxim of *prior in tempore, potior in jure,* rightly applied, in the absence of all equitable considerations between the assignors and assignees, to change this rule, or principle of law.

"It is obvious to every one making the least examination, that the authorities are greatly in conflict upon the subject; and we therefore felt at liberty to adopt that rule which seemed to us most consonant to equity and the nature and meaning of the mortgage contract."

The rule thus laid down has never been modified and has been applied from time to time. In *McLean v. Hoehle* (1898), 98 Wis. 359, 363, 74 N. W. 120, a foreclosure case, the court said:

"It is needless to discuss the subject of whether the foreclosure was of an indebtedness constituting a separate and distinct mortgage under sec. 3525, R. S. 1878, for if such were the case, there being no stipulation in the mortgage securing the instalments of indebtedness equally, the different instalments took precedence in the order they fell due; and a foreclosure under a prior instalment, completed by the exe-

cution and delivery of a deed, cut off all claims under subsequent instalments, the same as the foreclosure of any prior mortgage cuts off all claims under subsequent mortgages."

The rule was adhered to in *Shaw v. Crandon State Bank* (1911), 145 Wis. 639, 129 N. W. 794, although in that case it was held that there were superior equities as between different holders.

Applying these principles to the case at bar at the time of the issuance of the bonds dated March 1, 1905, bonds 177 and 178 owned by Fred Erbes had priority over bonds 179 to 184, inclusive, owned by the defendant American National Bank, but it is contended that Erbes by surrendering bonds 177 and 178 for bonds 73 and 74 of the sixth or refunding issue, which surrendered bonds were required by statute to be canceled upon surrender, Erbes lost his first lien and thereby his bonds were subordinated to those owned by the bank.

As already stated, this state is committed to the doctrine that the taking of a promissory note either for a preceding liability or a debt incurred at the time is not payment unless agreed to by both parties. There is no contention in this case that the acceptance of the refunding bonds by Erbes was a payment of the bonds of the first issue which he held. This being so the original indebtedness of the drainage district represented by bonds 177 and 178 was not discharged,—the time of payment was merely extended. It is contended on behalf of the bank that the exchange of the refunding bonds for bonds of the first issue extinguished the lien of these bonds for the reason that under the statute upon surrender the bonds must be canceled. While ordinarily an instrument is extinguished or destroyed by cancellation it is considered that cancellation did not have that effect under the applicable statutes. Not only was the time of payment extended but the time of paying the assessments on the lands upon which bonds 177 and 178 were a lien was also extended, and while under the statute the bonds of the first issue were to be canceled and

bonds of the refunding issue substituted therefor, there is nothing to indicate that it was the legislative intent to destroy the lien which the holder of bonds 177 and 178 had. The requirement that the bonds of the first issue should be canceled no doubt was for the purpose of preventing a single indebtedness from being represented by two outstanding bonds. If bonds of the first issue had been permitted to remain outstanding it would have been necessary to devise some method of ascertaining to whom the refunding bonds should be delivered. From an early day this court has held that a promissory note is merely the evidence of indebtedness. The substitution of one note for another does not discharge the debt evidenced thereby nor release the security given for its payment. *Williams v. Starr* (1856), 5 Wis. 534.

In this state a debt secured by a mortgage is the principal thing, the mortgage is an incident and the transfer of the debt carries the mortgage with it. *Croft v. Bunster* (1859), 9 Wis. *503; *Rice v. Cribb* (1860), 12 Wis. *179.

In the briefs of counsel the issue in this case is discussed in terms of a novation. We have ignored the terminology of that relationship because a novation under the circumstances of this case would be just another name for payment. Under the law of this state there is no novation unless the original indebtedness is extinguished by the substitution of a new debt. In this state that does not take place unless there is an express agreement to that effect.

At this point in the consideration of the questions involved we are confronted by the fact that a number of bonds of the first issue were exchanged for bonds of the refunding issue and that the holders of these bonds have not appeared in this action. Nor does it appear that an effective attempt has been made to make them parties to this proceeding. An attempt was made to serve the summons by publication. The order directed that notice should be given by mailing a copy of a notice of hearing to all bondholders; by publishing a copy of said notice in the Black River Falls Banner for two successive

weeks; by mailing a copy of said notice to the Continental Illinois National Bank & Trust Company of Chicago, Illinois; and by publishing a notice in the Chicago Journal of Commerce. This procedure did not conform to the procedure prescribed by sec. 262.13, Stats. The procedure in this case is in the nature of a winding-up action and should have been brought under the provisions of sec. 89.80. While sec. 89.80 is permissive in form it provides a complete scheme for the allowance of claims against a drainage district and the distribution of assets. While under the provisions of that section a composition agreement may be entered into, that is not a prerequisite to a proceeding under the section.

It is considered that the proceeding should be remanded to the circuit court; that upon the filing of the *remittitur* in the circuit court, the petition should be amended to conform to the provisions of sec. 89.80, Stats.; that when service has been had, the court should proceed to a final disposition of the matter in accordance with the terms of that section.

We have dealt with the matter of priorities so that the court may be advised as to the disposition of the proceeds so far as priorities are concerned. After service has been had the court can then deal with the matter in the light of the claims, including those already filed, which may then be on file.

*By the Court.*—The order appealed from is reversed, and the cause remanded for further proceedings as indicated in the opinion.

The following opinion was filed April 24, 1944:

Rosenberry, C. J. (*on motion for rehearing*). On motion for rehearing the parties moved to have the opinion clarified in two respects:

(1) As to the application of sec. 89.80, Stats., it is urged that while the district is unable to pay its bonds, it is a going concern and important to those landowners who have paid their assessment in full and that there is no desire on the part of those landowners to wind up the affairs of the district.

The proceeding under sec. 89.80, Stats., is not a winding-up proceeding in the sense in which that term is ordinarily understood. Here it appears in this case that the district has exhausted its ability to pay its obligations; that there remains on hand certain funds applicable to the payment of bonds. The question is, how that fund should be distributed.

It is considered that sec. 89.80, Stats., is the proper procedure to be followed. We are unable to see how the circuit court can get jurisdiction of this matter in any other way. The procedure here prescribed is special, applicable only to drainage districts. The procedure prescribed in sec. 89.80 should be followed in order that a proper decree of distribution can be made.

(2) On behalf of the bank it is contended that because the time of payment of bonds 177 and 178 was extended, those bonds lost their priority by reason of having the earliest maturity. It is considered that both upon general equitable principles and upon the provisions of sec. 1379—31*b*, 6, Stats. 1921, the bonds of earlier maturity do not lose their priority by reason of the extension of time of payment. Under this section, pursuant to which the bonds were issued, it was specially provided that the commissioners might refund any lawful indebtedness of the district and issue in lieu thereof new notes or bonds of such district payable in such longer time as the court shall deem proper.

Sec. 1379—10*c*, 1, Stats. 1921, provides:

"All proceedings under the drainage-district law are equitable in their nature. . . ."

Where the holder of the bond extends the time of payment for the convenience of the district, there would be little equity in requiring him to surrender his priority. To require him to forego his advantage would not only be inequitable but it would defeat the purpose of the statute which was to aid the district in the financing of the project.

The case of *Peoples Savings Bank of Evansville v. Finney* (1878), 63 Ind. 460, 461, is directly in point. In that case it was held that—

"several promissory notes, maturing successively and secured by the same mortgage on real estate, stand as so many successive mortgages, and have priority in the order in which they mature."

It was further held that—

"the fact that the holder of the note first maturing grants to the mortgagor, upon a valuable consideration, an extension of time beyond the maturing of the succeeding notes, does not give the latter priority over the former."

Both upon reason and authority, it is considered that bonds 73 and 74 have the same priority as bonds 177 and 178 in lieu of which they were issued. We think this clarifies the matters discussed in briefs on motion for rehearing.

*By the Court.*—Motion denied without costs.

* Motion for rehearing denied, with $25 costs, on April 24, 1944.