STATE of Wisconsin, Plaintiff-Appellant,

v.

Kathleen Marie GILBERT, Defendant-Respondent.

Supreme Court

*No. 82–1061. Argued November 4, 1982.—*
*Decided November 30, 1982.*

(Also reported in 326 N.W.2d 744.)

For the appellant the cause was argued by *Chris Heikenen,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

---

[10] *See In the Interest of T.R.B.,* 109 Wis. 2d 179, 180–81, 325 N.W.2d 329 (1982).

For the respondent there was a brief by *Kenneth W. Forbeck* and *O'Neal, Noll, Elliott, Forbeck & Iglesias, S.C.,* Beloit, and oral argument by *Kenneth W. Forbeck.*

For the intervenor there was a brief and oral argument by *Tod O. Daniel,* guardian *ad litem,* Janesville.

SHIRLEY S. ABRAHAMSON, J. This appeal is from a non-final order of the circuit court for Rock county, John H. Lussow, circuit judge. The court of appeals granted the state leave to appeal, secs. 808.03(2), 809.50, Stats. 1979–80, and this court granted the state's petition to bypass the court of appeals. Secs. 808.05(1), 809.60, Stats. 1979–80. The issue posed on appeal is whether the circuit court erred in quashing a subpoena *ad testificandum* requiring the attendance of a ten-year-old girl (BP) to testify at a preliminary examination, on the ground that the "best interests of the child" were served by not having her appear to testify in the courtroom before her alleged abuser (her mother).[1] We conclude that the circuit court erred in quashing the subpoena, and we vacate the order quashing the subpoena.

This case reaches this court at an unusually early stage in its procedural history, namely, during a preliminary examination which has been stayed pending this appeal. We wish to avoid, as much as possible, commenting upon the evidence introduced at the preliminary examination which has not yet been completed and therefore shall state only the facts necessary for resolution of the issue at hand.

On December 8, 1981, the state issued a criminal complaint against Kathleen Marie Gilbert, charging her with six counts of criminal conduct. The first four counts of the complaint concern Ms. Gilbert's alleged actions

---

[1] The basis of the circuit court's order was that testifying would be contrary to the child's best interests. BP's competency to testify was not in question.

toward her younger daughter, TG. The complaint charges Ms. Gilbert with the murder of TG, contrary to section 940.01(1), Stats. 1979–80; arson, contrary to sec. 943.02(1)(b), Stats. 1979–80; aggravated battery, contrary to sec. 940.19, Stats. 1979–80; and child abuse of TG, contrary to sec. 940.201, Stats. 1979–80. The last two counts of the complaint both concern Ms. Gilbert's alleged actions toward her older daughter, BP. The complaint charges Ms. Gilbert with the crime of injury by conduct regardless of life, contrary to sec. 940.23, Stats. 1979–80, and with child abuse, contrary to sec. 940.201, Stats. 1979–80.

On February 18, 1982, the preliminary examination commenced for the purpose of determining whether there is probable cause to believe that Ms. Gilbert committed a felony. Sec. 970.03, Stats. 1979–80. The state subpoenaed BP, the ten-year-old daughter, to testify at the preliminary examination. Tod O. Daniel, an attorney who had been appointed as BP's guardian ad litem in other court proceedings involving BP,[2] moved to quash the subpoena on the ground that BP would be emotionally harmed if she had to testify in the presence of her mother. The guardian ad litem argued that BP "is of such tender years and in such a psychological and emotional state that requiring her to testify creates a probability of psychological damage to her far outweighing the probative value of any testimony she may give."

The circuit court held hearings on the motion to quash at which a social worker and BP's foster mother testified. The substance of the testimony was that apparently Ms. Gilbert had severely abused BP, that BP

---

[2] BP's guardian *ad litem* apparently had been appointed to represent BP in proceedings to terminate Kathleen Gilbert's parental rights to BP. Secs. 48.40–48.43, Stats. 1979–80. Ms. Gilbert's parental rights had been terminated, but a final disposition was pending at the time of the preliminary examination.

feared her mother, that BP feared testifying in the presence of her mother, and that BP's behavior has, in the past, been adversely affected when she must see or confront her mother. The circuit court also received in evidence a psychologist's report regarding BP's verbal and motor skills. The report concluded that BP's "overall emotional development and adjustment is rather fragile and primative [sic]. Being exposed to unusual emotional events can result in marked regression."

After considering the testimony regarding the effect on BP of testifying in her mother's presence and taking judicial notice of the judicial proceedings relating to BP in which Ms. Gilbert's parental rights were terminated,[3] the circuit court balanced the likelihood of BP's suffering emotional damage by testifying against the state's interest in securing a conviction. The court concluded that "it would probably do great damage to BP if she were required to testify" and ordered the subpoena

---

[3] The parties stated at oral argument that the judge who presided over the preliminary examination had also presided at the proceedings to terminate Ms. Gilbert's parental rights.

Neither the defendant, the state, nor BP, through her guardian *ad litem*, objected to Judge Lussow conducting the preliminary examination in the criminal case while a disposition was still pending in the termination of parental rights proceeding, even though both cases involved alleged child abuse of BP.

The circuit court explained at both the hearing and in a letter the court wrote to the court of appeals explaining the reasons for its order that it was taking "judicial notice" of the termination of parental rights proceedings. The record before this court does not contain any part of the termination of parental rights proceedings. Neither party objected to the circuit court's taking judicial notice of the termination proceedings, and we do not decide this issue. It is clear, however, that this court cannot take notice of those proceedings. A court "can take judicial notice of many facts that are matters of indisputable common knowledge, [but] it cannot take judicial notice of records that are not immediately accessible to it or are not under its immediate control." *Perkins v. State*, 61 Wis. 2d 341, 346, 212 N.W.2d 141 (1973).

quashed. It stayed the preliminary examination pending the state's appeal.

The sole issue for our determination is whether the circuit court, acting in what it considered the best interest of the child, erred in quashing a subpoena *ad testificandum* which required the child-victim to testify at a preliminary examination.

In this case the application of a well-accepted legal principle—which is grounded in basic concepts of justice and fairness—conflicts with our sense of compassion.

The well-accepted legal principle, a fundamental tenet of our modern legal system, is that the public has a right to every person's evidence[4] except for those persons protected by a constitutional, common-law, or statutory privilege. This principle applies to all of us—even to the President of the United States. *United States v. Nixon,* 418 U.S. 683 (1974) ; *United States v. Fromme,* 405 F. Supp. 578 (E.D. Cal. 1975).

The principle and its corollary—that each person has a duty to testify—are basic to the adversary system. The integrity of the legal system depends on the court's ability to compel full disclosure of all relevant facts under the rules of evidence. The theory of the adversary system is that examination of all persons who have relevant information will develop all relevant facts and will lead to justice. *United States. v. Nixon,* 418 U.S. 683, 709 (1974).

Nonetheless, our sense of compassion tells us that we should do what we can to protect a ten-year-old who allegedly has been abused by her mother from further victimization in a legal system which is committed to protecting human rights. No sensitive person can read about child abuse without feeling anguish for the abused

---

[4] 8 Wigmore, *Evidence,* sec. 2192, p. 70 (McNaughton rev. 1961); *United States v. Nixon,* 418 U.S. 683, 709 (1974); *Wright v. Jeep Corp.,* 547 F. Supp. 871, 873 (E.D. Mich. 1982).

child or without understanding a child's needs and wishes to avoid confronting and accusing the alleged abuser in criminal proceedings, especially if the abuser is a close relative of the child. We commend Attorney Daniel, BP's guardian *ad litem,* for impressing upon us the importance of the issue we decide today and for his continuing concern for BP's well-being and his good counsel.

While we are concerned with the victim-witness child, we must also consider that although the district attorney's insistence on BP's testifying is portrayed as being cruel and insensitive, the district attorney is also concerned with BP's welfare. In demanding the testimony the district attorney represents BP's interest and the public's interest in prosecuting an alleged child abuser and murderer.[5] The district attorney contends that BP's

---

[5] "From the point of view of society's *right* to our testimony, it is to be remembered that the demand comes, not from any one person or set of persons, but from the community as a whole—from justice as an institution and from law and order as indispensable elements of civilized life. The dramatic features of the daily courtroom tend to obscure this. The matter seems to be between neighbor Doe and neighbor Roe. We are prone to shape our own course by the merits of the one or the other of their causes. But the right merely happens to be exemplified in the case of *Doe v. Roe,* that is all. The whole life of the community, the regularity and continuity of its relations, depends upon the coming of the witness. Whether the achievements of the past shall be preserved, the energy of the present kept alive and the ambitions of the future be realized depends upon whether the daily business of regulating rights and redressing wrongs shall continue without a moment's abatement, or shall suffer a fatal cessation. The business of the particular cause is petty and personal, but the results that hang upon it are universal. All society, potentially, is involved in each individual case. The vital process of justice must continue unceasingly. A single cessation typifies the prostration of society. A series would involve its dissolution. The pettiness and personality of the individual trial disappear when we reflect that our duty to bear testimony runs not to the parties in that present cause, but to the community at

testimony may be crucial to bringing the mother to trial. The district attorney faces the dilemma of letting the defendant go free or doing harm to the emotional well-being of the child-victim by compelling her testimony. Were the district attorney to decide not to call the child as a witness, the district attorney may protect the child's emotional interest in not being forced to face the alleged abuser and accuse the abuser of criminal acts, but may inflict a greater harm on the child by allowing the alleged abuser to go free and by demonstrating to the child that the state of Wisconsin does not place a high enough value on the child's suffering to bring to justice the person alleged to have caused the suffering.

We turn to the legal arguments in this case against the backdrop of the fundamental principle that every person must testify and the concern that the child victim-witness be protected to the extent possible from further harm resulting from the legal proceedings. We first consider whether any legal doctrine supports BP's claim for not testifying.[6]

Courts rarely excuse persons from the duty to testify; exemptions are "distinctly exceptional, being so many derogations from a positive general rule."[7] The exemp-

---

large and forever." 8 Wigmore, *Evidence*, sec. 2192, pp. 72–73 (emphasis in original). (McNaughton rev. 1961).

[6] This case does not involve the defendant seeking to have BP testify. The court, however, must keep in mind that the federal and state constitutions guarantee the defendant the right of confrontation. Amend. VI, U.S. Constitution; Art. I, sec. 7, Wisconsin Constitution. We do not decide in this opinion any issues related to the confrontation clauses in either the United States or Wisconsin constitutions.

[7] "For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving and that any exceptions which

tions recognized are narrowly drawn and are "grounded in a substantial individual interest which has been found, through centuries of experience, to outweigh the public interest in the search for truth." *United States v. Bryan,* 339 U.S. 323, 331 (1950).

Sec. 905.01, Stats. 1979–80, sets forth this state's adoption of the principle that each individual must testify and that privileges from testifying are limited.[8] BP's claim to be excused does not fall within the rules set forth in ch. 905, Stats. 1979–80.

Although BP cannot claim a statutory, constitutional, or common law privilege against testifying, it is arguable that she could claim exemption under sec. 805.07 (3), Stats. 1979–80, which grants the circuit court authority to quash the subpoena on the ground that it is unreasonable and oppressive. Sec. 805.07 provides in part as follows:

"805.07 **Subpoena.** (1) ISSUANCE AND SERVICE. Subpoenas shall be issued and served in accordance with ch. 885. A subpoena may also be issued by any attorney of record in a civil action or special proceeding to compel attendance of witnesses for deposition, hearing or trial in the action or special proceeding.

"(2) SUBPOENA REQUIRING THE PRODUCTION OF MATERIAL. A subpoena may command the person to whom

may exist are distinctly exceptional, being so many derogations from a positive general rule. . . ." 8 Wigmore, Evidence, sec. 2192, p. 70 (McNaughton rev. 1961) (note omitted).

[8] Sec. 905.01 provides as follows:

"Except as provided by or inherent or implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin, no person has a privilege to:

"(1) Refuse to be a witness; or

"(2) Refuse to disclose any matter; or

"(3) Refuse to produce any object or writing; or

"(4) Prevent another from being a witness or disclosing any matter or producing any object or writing."

it is directed to produce the books, papers, documents or tangible things designated therein.

"(3) PROTECTIVE ORDERS. Upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, the court may (a) quash or modify the subpoena if it is unreasonable and oppressive or (b) condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things designated therein."

Even if sec. 805.07 is applicable to criminal proceedings by virtue of sec. 972.11, Stats. 1979–80,[9] the statute does not apply here because sec. 805.07 (3) does not authorize the court to issue a protective order in the case of a subpoena *ad testificandum* (a subpoena to compel attendance of witnesses), as well as a subpoena *duces tecum* (a subpoena to compel production of books, papers, documents, or tangible things).

Subsection (3) states that the court may "quash or modify *the subpoena*" (emphasis added) which could mean a subpoena *ad testificandum* (sub. 1) or a subpoena *duces tecum* (sub. 2) or both. We construe that subsection as applying only to subpoenas *duces tecum*. We draw our conclusion from the subsection language and by reference to the statute's federal analogue. The language of the subsection indicates that it was intended to refer to subpoenas *duces tecum*. Sec. 805.07 (3) grants

[9] "972.11 **Evidence and practice; civil rules applicable.** (1) Except as provided in sub. (2), the rules of evidence and practice in civil actions shall be applicable in all criminal proceedings unless the context of a section or rule manifestly requires a different construction. No guardian ad litem need be appointed for a defendant in a criminal action. Chapters 885 to 895, except ss. 804.02 to 804.07, 887.23 to 887.26, 889.22, 895.29 and 895.30, shall apply in all criminal proceedings."

See *Hammill v. State*, 89 Wis. 2d 404, 409 n. 5, 278 N.W.2d 821 (1979).

the court two alternative remedies for an unreasonable and oppressive subpoena: quash the subpoena or condition denial of the motion to quash upon advancement of reasonable costs of producing the documents. Since the second remedy is limited by the words of sec. 805.07 (3) to a subpoena *duces tecum,* it would appear that the first alternative is similarly limited.

The interpretation that sec. 805.07(3) was intended to apply only to subpoenas *duces tecum* is consistent with the federal courts' interpretation of the analogous federal rule. Federal Rule of Criminal Procedure 17 is similar to the Wisconsin statute governing subpoenas. It provides, in part:

"(a) *For Attendance of Witnesses; Form; Issuance.* A subpoena shall be issued by the clerk under the seal of the court. It shall state the name of the court and the title, if any, of the proceeding, and shall command each person to whom it is directed to attend and give testimony at the time and place specified therein. The clerk shall issue a subpoena, signed and sealed but otherwise in blank to a party requesting it, who shall fill in the blanks before it is served. A subpoena shall be issued by a United States magistrate in a proceeding before him, but it need not be under the seal of the court.

". . .

"(c) *For Production of Documentary Evidence and of Objects.* A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. *The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive.* The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys." (Emphasis added.)

Like the Wisconsin statute, the federal rule provides authority to "quash or modify *the subpoena*" (emphasis

added) if compliance would be unreasonable or oppressive, but the authority to quash is in a section concerning the subpoena *duces tecum.* Rule 17(c) has been interpreted as applying only to subpoenas *duces tecum.* *See* 8 Moore's Federal Practice, ¶ 17.06 (1982), 2 Wright *Federal Practice and Procedure,* Criminal 2d, sec. 275 (1982). We can find no authority in sec. 805.07(3) or in any statute, court rule, or court decision that a circuit court is empowered to quash a subpoena to compel testimony on the grounds that the subpoena is unreasonable or oppressive.[10]

In quashing the subpoena in this case the circuit court did not rely on any statute, rule, decision, or constitutional provision granting the child the privilege of refusing to be a witness on the ground of emotional harm. The question therefore is whether a circuit court's inherent power to preserve and protect the exercise of its judicial function of presiding over the conduct of judicial proceedings, *State v. Holmes,* 106 Wis. 2d 31, 40, 315 N.W.2d 703 (1982); *Dutcher v. Phoenix Insurance Company,* 37 Wis. 2d 591, 606, 155 N.W.2d 609 (1968), includes the power to quash the subpoena in this case. In determining whether the circuit court erred in this case, we measure its action, namely, completely

[10] We examined the judicial council's files to determine whether our interpretation of sec. 805.07(3) comports with the judicial council's intent in drafting the provision for protective orders. Our search was not enlightening. Subsections (2) and (3) were originally drafted as a single subsection substantially similar to Federal Rule of Civil Procedure 45, Federal Rule of Crim Procedure 17. At a later stage the single subsection was divided into the existing subsections (2) and (3). The original single subsection was applicable only to a witness served with subpoena *duces tecum.* The correspondence in the judicial council files which we examined indicates that some members believed that a court should be able to issue protective orders for subpoenas *ad testificandum* but the correspondence is unclear as to whether subsection (3) does or does not extend to witness testimony.

excusing the witness from testifying, against the fundamental principle of the adversary system that every person is required to give testimony.

We can find no precedent, and none has been cited, that a court may completely excuse a witness from his or her obligation to testify because of the witness's claim of emotional harm. In cases in which adult witnesses have asked to be excused from their duty to testify on the grounds of personal fear of reprisal, or fear for the witness's family's safety, courts have generally been reluctant to excuse the witness, concluding that the public policy in favor of compelling testimony outweighs the possible harm that testifying would cause.[11] This court has strictly construed the public policy in favor of having a witness testify when the witness claims emotional damage. The court refused to allow the use of a deposition in lieu of live testimony in a criminal case when the argument was made that the witness was unavailable because testifying would cause him psychiatric illness.[12]

We could find only one situation in which a court has exempted a witness from the obligation to testify because of possible emotional damage to the witness. In the context of child custody proceedings, some courts protect a child from testifying after examining the child to determine that testifying would not be in the

[11] *Davis v. Alaska*, 415 U.S. 308, 319 (1974) (desire to remain anonymous and not to be embarrassed); *State v. Jones*, La., 363 So. 2d 455 (1978) (fear of defendant's reprisal for witness's testimony); *Piemonte v. United States*, 367 U.S. 556, 559 n. 2 (1961) (fear for family's safety); *Wright v. Jeep Corp.*, 547 F. Supp 871 (E.D. Mich. 1982) (chilling effect of disclosure of researcher's notes). *See also* Mass, *The Dilemma of the Intimidated Witness in Federal Organized Crime Prosecutions: Choosing Among the Fear of Reprisals, the Contempt Power of the Court, and the Witness Protection Program*, 50 Fordham L. Rev. 582 (1982).

[12] *Sheehan v. State*, 65 Wis. 2d 757, 223 N.W.2d 600 (1974). *See also Keshishian v. State*, 386 A.2d 666, 667 (Del. Super. Ct. 1978).

best interest of the child. The theory behind this exemption is that since the proceeding focuses on the best interest of the child the court should not do injury to the child by forcing the child to testify.[13] Exemption of a child's testimony in child custody proceedings is not relevant to this case though because the policies underlying civil child custody determinations are not the same as those underlying criminal proceedings.

While courts continue to recognize the strong public policy in favor of compelling testimony, the criminal justice system has in recent years begun to take cognizance of another public policy which has been gaining acceptance: assisting victims and witnesses in the criminal justice system. States have enacted statutes that allow victims to be compensated for their suffering.[14] Several states have addressed problems that the judicial process may cause to certain witnesses such as rape victims.[15] The National District Attorneys Association has

[13] *JLW v. DCW*, 519 S.W.2d 724 (Mo. App. 1975); *RSM v. JDM*, 542 S.W.2d 361 (Mo. App. 1976). Even in this situation, other states follow a contrary rule. *See Cline v. May*, 287 S.W.2d 226, 228 (Tex. Civ. App. 1956); *Callicott v. Callicott*, 364 S.W.2d 455, 458 (Tex. Civ. App. 1963); Annot., *Child's Wishes as Factor in Awarding Custody*, 4 ALR3d 1396 (1965).

[14] *See, e.g.*, ch. 949, Stats. 1979–80.

[15] These enactments usually eliminate or severely circumscribe a defendant's ability to cross-examine the victim-witness about her/his prior sexual conduct with persons other than the defendant. *See, e.g.*, sec. 972.11(2), Stats. 1979–80. Courts considering challenges to these kinds of laws have recognized that the motivation enacting the statutes may have been witness protection but have upheld the constitutionality of these statutes based on the irrelevancy of the evidence sought to be adduced. *See, e.g., State v. Herrera*, 92 N.M. 7, 582 P.2d 384 (1978); *People v. Thompson*, 76 Mich. App. 705, 257 N.W.2d 268 (1977); *Roberts v. State*, 268 Ind. 127, 373 N.E.2d 1103 (1978); *Johnson v. State*, 146 Ga. App. 277, 246 S.E.2d 363 (1978); *People v. Blackburn*, 56 Cal. App 3d 685, 128 Cal. Rptr. 864 (1976); *State v. Jalo*, 27 Or. App. 845, 557 P.2d 1359 (1976); *Milenkovic*

identified the area of assisting victim-witnesses as one of its priorities in improving the criminal justice system.[16]

Society's increasing awareness of the needs of victim-witnesses in the criminal justice system has coincided with society's increased awareness of and growing concern about incest and child abuse, crimes that particularly affect children.[17] The legal system must be examined to determine the traumatic effects the system may have on children who take the witness stand. Commentators are suggesting various changes that can be made in the justice system[18] and legislation is being developed to protect child victim-witnesses from possibly harsh and insensitive aspects of the criminal justice system.[19]

---

*v. State*, 86 Wis. 2d 272, 272 N.W.2d 320 (Ct. App. 1978). *See* Tanford and Bocchino, *Rape Victims Shield Laws and the Sixth Amendment*, 128 U. Pa. L. Rev. 544 (1980); Gold and Wyatt, *The Rape System: Old Roles and New Times*, 27 Cath. U.L. Rev. 695 (1978); Berger, *Man's Trial, Women's Tribulation: Rape Cases in the Courtroom*, 77 Colum. L. Rev. 1 (1977); Rudstein, *Rape Shield Laws: Some Constitutional Problems*, 18 Wm. & Mary L. Rev. 1 (1976).

[16] Commission on Victim Witness Assistance of the National District Attorneys Association, *Help for Victims and Witnesses*, p. 1 (Feb. 1976).

[17] *See, e.g.*, ABA, National Legal Resource Center for Child Advocacy and Protection, *Innovations in the Prosecution of Child Sexual Abuse Cases*, p. 137 (1981).

[18] *See, e.g.*, Libai, *The Protection of the Child Victim of a Sexual Offense in the Criminal Justice System*, 15 Wayne L. Rev. 977 (1969); Parker, *The Rights of Child Witnesses: Is the Court a Protector or Perpetrator?*, 17 New Eng. L. Rev. 643 (1982); Gage, *Protecting the Juvenile Witness*, 17 J. Fam. L. 439 (1978–79); Meyers, *When Children Take the Stand*, 11 Student Lawyer 14 (No. 1 Sept. 1982); ABA, National Legal Resource Center for Child Advocacy and Protection, *Innovations in the Prosecution of Child Sexual Abuse Cases*, 7–8, 112–16 (1981).

[19] *See, e.g.*, 1981 AB 751 (Wis.) (not passed); ABA, Section of Criminal Justice, Victim Witness Assistance Project, *Victim/*

The judiciary has not been oblivious to concerns about the emotional health of witnesses. Judicial concern has manifested itself in courts' increasing willingness to accept the witness's claim of danger or fear as a justification for allowing the witness to refuse to respond to certain questions propounded during the witness's testimony.[20] Courts have fashioned rules to protect children, scrupulously taking into consideration both the traumatic effect on the child of testifying, of facing the defendant, and of being subject to cross-examination, and the accused's constitutional right to confront witnesses. Thus, trial courts have limited a defendant's right to interview child witnesses alone, particularly where the children were victims or close relatives of victims of violent crimes; they have allowed attorneys to ask leading questions of children; they have, out of concern that the child victim be spared the pain of testifying, expansively viewed the excited utterance exception to the hearsay rule to allow persons to testify as to the child's accounts of sexual abuse.[21]

While we have found much public, legislative, and judicial concern for the needs and well-being of the child-victim-witnesses, we have not found any suggestion in

---

*Witness Legislation: Consideration for Policymakers* (1981); *Help for Victims and Witnesses, supra* note 16.

[20] *United States v. Cavallaro,* 553 F.2d 300, 304 (2d Cir. 1977); *State v. Novosel,* 120 N.H. 176, 412 A.2d 739, 745 (1980); *State v. Caldwell,* 303 Minn. 297, 227 N.W.2d 382, 386 (1975).

[21] Limiting right to interview child alone, *Mackie v. State,* 138 Miss. 740, 103 So. 379 (1925); *Holladay v. State,* 130 Tex. Crim. 591, 95 S.W.2d 119, 120 (1936); leading the witness, *Commonwealth v. Carrion,* 370 Mass. 408, 348 N.E.2d 754 (1976); excited utterance, *Bertrang v. State,* 50 Wis. 2d 702, 707, 184 N.W.2d 867 (1971), *State v. Boodry,* 96 Ariz. 259, 394 P.2d 196 (1964), *contra: Ketcham v. State,* 240 Ind. 107, 162 N.E.2d 247 (1959). *See also, Grabowski v. State,* 126 Wis. 447, 451–52, 105 N.W. 805 (1905); *Allbritten v. State,* 262 Ind. 452, 317 N.E.2d 854, 855 (1974).

the legal literature that the child be excused completely from giving testimony and that the child's testimony not be available in the criminal proceeding. The proposals that we have read attempt to accommodate the needs of the child victim-witness within the context of the public policy of achieving justice through the adversary system.

That no one proposes completely excusing children from making their testimony available in criminal proceedings is perhaps the accommodation of two competing concerns for the child's welfare. The first concern is to protect the child (and other children) from further injury by bringing to trial the alleged perpetrator of the crime. The second is to protect the child from being injured by the search for justice in the legal system. These two concerns conflict when the child who seeks to be protected as a witness is the only person who can testify against the defendant. The child is usually the only witness to the abuse, and the child's testimony is usually crucial to the state's case against the abuser. As one commentator observed, in "abuse cases, the eyewitness testimony of the youngster involved may be the only direct link between the child and the offender; any other evidence is generally circumstantial physical evidence that indicates only that abuse was committed." Meyers, *When Children Take the Stand*, 11 Student Lawyer 14, 15 (No. 1, Sept. 1982).

Excusing BP from testifying might spare her stress now but might harm her in the long run by failing to allow the state to bring to trial and possible conviction the alleged abuser. BP should tell her story not because this court disbelieves her claim of terror but because she has been terrorized.

We conclude that the circuit court erred in this case in quashing the subpoena. The circuit court should,

however, use the tools available to the criminal justice system to eliminate or lessen the burden on BP while making her testimony available in the criminal proceeding. The court should afford the child witness in a criminal proceeding as much protection as is consistent with the public interest in convicting the guilty and with the constitutional rights of the accused. BP is a child who has suffered greatly. The legal system should not add to her suffering. As one commentator observed, it becomes tragically ironic when the legal system, acting as the child protector of last resort, becomes a perpetrator of child abuse.[22]

The circuit court has power, within constitutional limits, to alter courtroom procedures to protect the emotional well-being of the child witness. Neither the district attorney nor defense counsel has unfettered discretion to treat the child witness in a callous manner. The district attorney should heed the advice of the Commission on Victim Witness Assistance of the National District Attorneys' Association: "[W]ith a sense of purpose and with the application of common sense, criminal justice agencies can do much to serve the needs of citizens whose lives have been damaged and interrupted by crime."[23]

Defense attorneys should remember that although they are obligated to represent their clients zealously, they do not violate the rule of zealous representation "by acceding to reasonable requests of opposing counsel which do not prejudice the rights of the lawyer's client . . . [and] by avoiding offensive tactics or by treating with courtesy and consideration all persons involved in the legal process." SCR 20.35(1)(a) (1982).

---

[22] Parker, *The Rights of Child Witnesses: Is the Court a Protector or Perpetrator*, 17 New Eng. L. Rev. 643 (1982).

[23] *Help for Victims and Witnesses, supra* note 16, pp. 1–2.

It is the responsibility of the district attorney, defense attorney, guardian *ad litem,* and the circuit judge to use their collective intellectual resources to devise a way so that BP testifies with minimal trauma, in this and in future court proceedings. We note that several solutions have been proposed to the problem of taking the testimony of the child victim-witness.[24] We do not advocate or give our approval to any particular solution. We believe that the attorneys and circuit judge closest to this proceeding are in the best postion to attempt to devise a solution, keeping in mind BP's particular fear of facing her mother, to eliminate or minimize the burden on BP, to protect the constitutional rights of the accused, and to protect the public interest in the fair administration of justice and in bringing the accused to trial.

*By the Court.*—The order of the circuit court is vacated and the cause remanded to the circuit court for further proceedings consistent with this opinion.

---

[24] *See, e.g.,* Meyers, *When Children Take the Stand,* 11 Student Lawyer No. 1, 14, 16 (Sept. 1982) (conducting proceedings in surroundings more comfortable than the courtroom; physically blocking the witness's view of the defendant); Parker, *The Right of Child Witnesses: Is the Court a Protector or Perpetrator,* 17 New Eng. L. Rev. 643 (1982) (allow the child to testify behind a one-way mirror); *United States v. Fromme,* 405 F. Supp. 578, 583 (E.D. Cal. 1975) (videotaped depositions); *State v. Harris,* 268 S.C. 117, 232 S.E.2d 231 (1977) (videotaped depositions).