HUTSON and others, Respondents, vs. JENSON and another, imp., Appellants.

*March 20 — April 9, 1901.*

*Guardian and ward: Mutual benefit societies: Certificate: Designation of beneficiary: Change: By-laws: Evidence: "Family": Wills: "Estates": Residuary bequest: Accounting: Sureties: Support of wards: "Investments."*

1. Where a widow, who was designated in a certificate of membership in a mutual benefit society as trustee for certain children of her husband, was appointed guardian of such children, and subsequently received the proceeds as trustee, the ownership thereof by her wards being clear and unambiguous, she is liable as guardian from the time the money was paid to her.

2. Where in an application for insurance in a mutual benefit society the applicant declared his wish that it should be for the benefit of his "estate," but the association issued and he accepted a certificate which agreed that the association should pay the "family" of the member, the contract is expressed by the certificate, and not by the application.

3. In such case, the proceeds having come to the hands of the executrix of the member, who was also guardian of minor members of his family, she is chargeable as guardian for the share thereof belonging to her wards.

4. In the absence of any evidence that such applicant ever designated any beneficiary other than his "family" the fact that, after the certificate was issued, the by-laws of the society were changed so as to authorize the payment to any designated beneficiary, instead of limiting payment to the "family," is immaterial.

5. Where a certificate of membership in a mutual benefit society was payable to "the family" of the member, who left children by his surviving widow and one child by a former marriage, such child is one of the class designated as "the family" of the member, and entitled to his *pro rata* share of the proceeds.

6. The proceeds of a certificate of membership in a mutual benefit society, payable to designated beneficiaries, can in no proper sense be said to be any part of the estate of the member, and there can be no inference of intent to change the already designated beneficiaries by a mere residuary clause in the member's will.

Hutson and others vs. Jenson and another.

7. A mother, who was also guardian of her minor children, filed a report stating that all of said minors were living with her, and that she made no change at that time on account of expenses, such as board and clothing, for any of the wards, and they continued to reside with her until her death, six months later, without her having receded from such expressed intention. *Held*, that the sureties on the guardian's bond were not entitled to an allowance for such board and clothing, when sued for a balance due from their principal.

8. Where a guardian ostensibly invested her ward's money in a loan to herself, giving notes and mortgages on her own property to her wards, the transaction cannot be treated as in any respect an investment of the trust funds.

9. In such case the mortgage may be treated as an application by the guardian of so much of her property to a repayment of the money improperly diverted, and, in an action therefor against the sureties on her bond, they are entitled to credit for all sums realized thereon.

10. Where a guardian ostensibly invested her wards' funds by a loan to herself, giving notes secured by mortgage on her own property, and a subsequent guardian, by pledging such securities, raised money which he expended for the wards' benefit, in an action against the sureties of the first guardian to recover such funds so wrongfully loaned, the sureties are entitled to a credit for the amount so expended by the second guardian for the wards.

APPEAL from a judgment of the circuit court for Rock county: B. F. DUNWIDDIE, Circuit Judge. *Modified and affirmed.*

About November 7, 1893, there died, at Edgerton, Thomas Hutson, a man of considerable property and president of the Edgerton Bank, leaving a large amount of life insurance, some payable to himself, some specifically to his wife, and, in addition, policies as follows:

First. Two policies, aggregating $4,000, in the Bankers' Life Association, payable according to the certificate to the family of the deceased. The by-laws, when the certificate was issued, provided that benefits should be payable to the family, and were subsequently amended to provide that they should be paid to "the family or other designated beneficiary, upon receipt of the person designated in the original

application or by a subsequent acknowledged document." The application designated as beneficiary "my estate," and by a subsequent document, not acknowledged, Charles L. Burnham was designated trustee to receive the money.

Second. One policy for $2,000 in the Bankers' Life Association, the certificate payable to the family or other designated beneficiary, while the application designated four of Hutson's children by name, of whom the plaintiffs were three, and designated his wife, Martha Hutson, as trustee to receive payment.

Third. A policy of the Modern Woodmen for $2,000, payable to four children, designated by name, of whom plaintiffs *John F. Hutson* and *Myrtle Hutson* were two.

Fourth. A policy in the New York Life Insurance Company for $257.16, payable to four children, designated by name, among whom were plaintiffs *John F. Hutson* and *Myrtle L. Hutson.*

Fifth. A policy in the Equitable Life Association for $485.35, payable to the plaintiff *Roy J. Hutson.*

Charles L. Burnham, named as trustee in the first two policies, was cashier of the Edgerton Bank, and in connection with Charles T. Hutson, a son of the deceased, conducted the correspondence with reference to the collection of these various policies, which were paid as follows: "The $4,000, by a draft to Charles L. Burnham, trustee, upon a receipt signed by him as "Trustee for the Beneficiary, the Estate of Thomas Hutson." The second was paid by draft to Martha Hutson as trustee, upon her receipt as "Trustee for the Beneficiaries, *Roy James,* Maude Alice, Charles Thomas, *John Franklin,* and *Myrtle Leah Hutson.*" All the other policies were paid by drafts to, and upon receipts signed by, Martha Hutson as guardian. She was appointed guardian of the five minor children of the deceased and herself November 17, 1893, and was appointed executrix of the estate of Thomas Hutson on December 6, 1893. The several

insurance drafts were received in the intervals between her appointment as guardian and as executrix. As they were received, Burnham deposited them in the Edgerton Bank, and issued therefor certificates of deposit, which he placed in a box or receptacle containing papers relating to Thomas Hutson's estate, accessible to Mrs. Hutson, but which she personally never visited. These certificates of deposit varied in form. That for the $4,000 certified that Charles L. Burnham, trustee, had deposited $4,000, "payable to the family of Thomas Hutson on the return of this certificate properly indorsed." The certificate for the $2,000 from the Bankers' Life certified that Martha Hutson, trustee for specified children, had deposited $2,000, "payable to the order of —— on return of this certificate properly indorsed." The others certified that Martha Hutson, guardian, had deposited several sums. On June 29, 1894, while Mrs. Hutson was both guardian and executrix, all of these certificates of deposit were deposited to the general estate account in the bank, which was carried in the name of Thomas Hutson, and that account immediately thereafter was absorbed by a charge against it of notes due from Thomas Hutson, at the time of his decease, to the bank.

Thomas Hutson's will, executed in February, 1893, bequeathed $50 to each of his children, including the five children by Martha Hutson and one son by a prior marriage, and also $50 each to his two stepdaughters, and thereupon bequeathed and devised "all the rest and residue of my property, real, personal, or mixed, wheresoever situated, which I now own or may hereafter acquire, and of which I shall die seised or possessed," to his wife, Martha Hutson, whom he also constituted executrix. She filed an assumption of all debts of the estate, all persons supposing it then to be solvent, which supposition proved to be erroneous, in part, at least, by reason of the failure of the Edgerton Bank, which occurred in or about October, 1897.

On December 5, 1894, Martha Hutson, as guardian, filed a so-called report with the county court, commencing first with the inventory, describing the estate of the minors as no real estate and as personal property:

"Received for account of *Myrtle L. Hutson:*

| | |
|---|---|
| "Bankers' Life Insurance Co | $666.66 |
| "     "        "        " | 400.00 |
| New York Life Insurance Co | 64.29 |
| Modern Woodmen Insurance Co | 500.00 |
| From Estate of Thomas Hutson | 50.00 |
| | $1,680.95" |

Like items were specified as received for the account of *John F. Hutson,* and items in like form, but differing according to the fact, as to *Roy J. Hutson,* aggregating $1,602.02. The so-called report then proceeds:

| | |
|---|---|
| "Loan on note and mortgage bearing date April 1, 1894: | |
| "For account of *John F. Hutson* | $1,630.95 |
| Cash on hand for said account | 50.00 |
| | $1,680.95" |

Same as to *Myrtle Hutson,* and same as to *Roy J.,* except his note was $1,552.02. The report concludes:

"Interest on above notes is payable annually on the 1st day of April, at the rate of six (6) per cent. per annum from date. All of said minor heirs are living with said guardian, and she will make no charge at this time on account of expenses, such as board and clothing, for any of them," — dated November 15, 1894.

The report included as well the other then minors, who have since come of age. The notes and mortgage here described were notes of Mrs. Hutson to her several children, all secured by a third mortgage on a farm coming to her as devisee of her husband; the prior mortgages amounting to some $11,000. The notes to the several children were payable in the order of their respective majorities. Martha Hutson died in May, 1895, and her estate proved to be insolvent by reason of her assumption of her husband's debts.

Thereafter Charles L. Burnham was appointed guardian for the three children who are plaintiffs, received the notes and mortgage which had been executed by their previous guardian, collected two years' interest thereon, amounting to $195 for each of the minors, and raised $2,000 by pledging said three notes as collateral security to his own note, all of which moneys, with the exception of about $300, were expended by him for the support of his wards. After the failure of the bank he fled, and his sureties made settlement, under authority of the county court, whereby they paid $300, being substantially the unexpended balance of said $2,000, the defendant *Jenson* being one of such sureties.

The present action was thereupon commenced against these defendants as sureties upon the guardianship bond of Martha Hutson. It was stayed by order of court, pending the foreclosure of the several mortgages upon the farm. As a result of such foreclosure and sale thereunder the two prior mortgages were satisfied, and the notes first coming due to the two elder children were substantially satisfied, on the theory that such notes, by reason of their prior maturity, were prior liens, and a balance of $321 remained applicable to the three notes given to the plaintiffs. The trial court held that the $50 item credited by Martha Hutson as guardian to each of her children was never received by her as such, it being a legacy from her deceased husband, whose estate was more than exhausted by his debts, but held that all of the other items specified in the inventory above mentioned came to her in her capacity as guardian and she became responsible to account therefor, that the pretended loan to herself upon third mortgage was not a legitimate credit, and that the notes given might be rejected by the plaintiffs; but the sureties, declaring no preference, credited to the guardian's account the $321 realized upon the mortgage. He also credited the two years' interest which had been actually received by the succeeding guardian, Burnham, and,

except for these credits, held the guardian's debtor account to consist of the amount of each of said notes, with interest at the rate of six per cent. from April 1, 1894; for which sum judgment was entered against the defendants, from which this appeal is brought.

For the appellants there was a brief by *Jackson & Jackson* and *J. M. Clancy*, attorneys for *Jenson*, and *Sutherland & Nolan*, attorneys for *Attlesey*, and oral argument by *A. A. Jackson* and *G. G. Sutherland*.

For the respondents there was a brief by *Jones & Stevens*, and oral argument by *B. W. Jones*.

DODGE, J. This case presents one of those unfortunate situations where money claimed to be the property of helpless children has been lost by the conduct of the person intrusted therewith, in this case without any suggestion of turpitude or intentional wrong, but by mistaken confidence in the solvency of a bank and in the sufficiency of her own means to make good any losses, and where, on the other hand, the persons from whom indemnity is demanded are sureties merely, who have neither participated in the misconduct causing the loss nor received any benefit to compensate the burdens they have assumed. Such cases unavoidably arouse sympathy for each side of the controversy, and demand the most anxious care that no undue loss be permitted to fall upon the one side, nor burdens be imposed upon the other beyond the strictest letter of liability. Both helpless minors and those who, as sureties merely, guarantee faithful performance of the duties of guardians, are favored in the courts. Nevertheless, to the extent of the liability assumed by the surety, his contract must be enforced. It is as men *sui juris* and with full understanding of the purpose of their act that they execute the bond, upon the strength of which the property of those not able to protect themselves is placed in subjection to the discretion and will of another. Their

contract is to make good to those minors whatever may be lost by the improper or unlawful exercise of such discretion and will. No doctrine of estoppel or consent can be effective, as against minors, to authorize or excuse misconduct by their guardians, or to relieve from the liability in fact assumed by those who have guaranteed against such misconduct. In this case a mother, supposed by herself and every one else to have abundant means of her own, has so handled certain moneys claimed to belong to her minor children that they have lost the same. Her death in a state of insolvency soon after such conduct disappointed the expectations of all — herself, her children, and her sureties — that from her own means at any time could be made good any such moneys.

The first question naturally is, What moneys belonging to her children came to her hands under such circumstances that, as guardian, she owed the duty of care and reimbursement? The insurance money with which she is charged by the judgment in this case unquestionably all came within her custody and control at a time when she was guardian, and at a time, therefore, when it was her duty in that capacity to reduce to possession all moneys of her wards within her reach and to properly care for the same. As to the proceeds of all of the insurance other than that in the Bankers' Life Association there is no ambiguity. It was paid to her and receipted for by her in her capacity as guardian, and unquestionably belonged to her minors, subject only to the question whether it had been disposed of otherwise by the will of her husband, to be considered later. As to the moneys paid by the Bankers' Life Association upon the three certificates of membership issued to Thomas Hutson in his lifetime, neither the payment, the receipt, nor the ultimate disposal of the money can be said to be so entirely unambiguous as to make it proper to charge Mrs. Hutson's sureties with liability further than it shall be found that the

moneys in reality belonged to the minors for whom she was guardian.   Those moneys, while undoubtedly coming within her control, so that she had full opportunity to carry into the guardianship estate all of them which belonged there, were in fact neither so carried into that estate specifically nor taken out of the general funds of the estate of her husband, but that she might have been chargeable either in her individual capacity or as executrix therefor, if they did not belong to the guardianship estate, and, if the latter view should prevail, her sureties should not be held liable for them.

As to the $2,000 received by her as designated trustee for certain specified children under a certificate of membership which promised payment "unto the family of said deceased or other designated beneficiary," issued upon an application designating the specific children as beneficiaries, there can be no hesitation in declaring the guardian's liability, subject to the question of disposition by will above suggested. The money came to her possession when she was guardian. True, it came to her as trustee; but the ownership thereof by her wards was clear and unambiguous.   Such was the contract which Thomas Hutson had made with the association, and in that character and for that purpose was the money paid by that association and received by her. It was her duty as guardian to reduce that money to her possession in that capacity.   Had it been in the hands of another, it would have been her duty to demand it.   Being in her own proper possession, the law must treat her as holding it in the capacity in which it was her duty to hold it.   As to this fund, therefore, her duty as guardian arose from the time it was paid to her by the association.

As to the moneys paid upon the two earlier certificates in the Bankers' Life Association, there is no room for hesitation.   The money was paid by the association to Charles L. Burnham as trustee for the estate of Thomas Hutson.

It was by him placed in a certificate of deposit by its terms payable to the family of the deceased, and that certificate was by Martha Hutson deposited to her account as executrix. It was thus within her control, and, if the moneys belonged to her wards, she must be chargeable therefor. It is strenuously contended that such money did not belong to those minors, but did belong to the general estate of Thomas Hutson. This contention is predicated on the fact that in 1886 Thomas Hutson, in making application for this membership, declared his wish that it should be for the benefit of his estate. We perhaps need not consider what would have been the rights of the parties, had the association entered into contract with Thomas Hutson in accordance with this application. The books are full of discussion and decision as to the possibility of associations such as the Bankers' Life entering into contracts whereby the benefits they promise shall be payable into the general estate of the member, and thus inure to the benefit of his creditors, to the exclusion of his family and dependents. Extended discussion upon this subject will be found in Bacon, Benefit Societies, ch. VII; some authorities going to the extent of holding that such an application is so foreign to the ordinary purpose of a benefit society that the designation " my estate " will be construed to merely indicate generally the family or heirs of the member. *Eppinger v. Canepa*, 20 Fla. 262.

Such discussion is rendered unnecessary in this case, however, by the consideration that, not the application, but the certificate issued to Thomas Hutson by the association, expressed the contract between them. It was entirely within the power of the association to decline to make a contract upon the terms requested by the applicant, and entirely within his power to accept the contract which the association was willing to make. Indeed, there is much force to the contention that the association, under its by-laws as then

existing, had not the power to make a contract assuring payment to the general estate of Thomas Hutson. Whether it had power or not, however, it did not so contract. It issued to him, and he accepted and retained for many years, a contract which in terms promised that upon his death and after due proof the association "shall and will well and truly pay at the office thereof in St. Paul, unto the family of said deceased, upon receipt of said representative thereof, the sum," etc. This was the contract which was made and from which grow the rights of the parties. It is urged, and may well be conceded, that during the life of the member the designated beneficiary has no vested ownership in the fund nor in the contract between him and the association; that such contract can be terminated by the member, or a substituted beneficiary can be agreed on. In the light of this position, it is pointed out that before Thomas Hutson's death the power of the association was enlarged by by-law, so that it was empowered to promise payment of the stipulated sum to any other designated beneficiary. Such circumstance is, however, immaterial; for there is no proof offered that any attempt was made to change the contract as originally made. That contract, once made, must persist until changed in some way. The fact that originally Thomas Hutson requested a contract whereby/the benefit should be payable to the estate, which the association refused to make, but made another whereby the benefit was promised to be paid to his family, surely is not effective to change this contract years afterwards. It may well be that after the amendment of by-laws in 1892 Thomas Hutson might have designated some beneficiary other than his family in the manner prescribed by these by-laws; but discussion of that question is bootless, for he did not do so. We are therefore constrained to the conclusion that the $4,000 paid by the association to Charles L. Burnham as trustee, at the moment of its payment, belonged to the family of Thomas Hutson, as was decided by the circuit court.

At the next step, however, we are persuaded the trial court went astray. Thomas Hutson had, at the time of taking this membership and at the time of his death, a wife and six children. Five of those children were hers as well. The sixth was by a prior marriage. No reason is apparent why the eldest son was not as much a member of the class designated as "the family" of the deceased as any of his other children. He is classed with the other sons by testator in his will, and if, as seems proper, the word "family" in this connection be construed as wife and children, this eldest son, Fred C. Hutson, was as much an owner in this fund as any of the other children. See *Jackman v. Nelson*, 147 Mass. 300. From this view it results that the share of each in this $4,000 was one seventh, instead of the one-sixth adopted by the trial court, or $571.43, instead of $666.66, a deduction of $95.23 from each of the three plaintiffs.

Apart from the foregoing considerations, it is further strenuously contended by the appellants that by the will of Thomas Hutson all of this insurance was made the property of his widow, Martha Hutson. That will contains a specific bequest of $50 to each of the testator's children by name and to each of two stepdaughters by name, and then bequeaths absolutely and in fee simple to his wife "all the rest and residue of my property, real, personal, or mixed, wheresoever situated, which I now own or may hereafter acquire and of which I may die seised or possessed." In attempted support of this contention the appellants' counsel have brought before us an array of decided cases which speaks eloquently their industry on behalf of their client and which we have little doubt fully exhausts the field of authority even apparently favoring them. We need not pass upon these authorities in detail. It may be said that they generally relate to cases of disposal of insurance moneys by express designation, or to cases where by the terms of the policy the money was to pass by will of the assured. Suffice

it to say, however, that we find no well-considered decision sustaining the proposition that a general residuary clause in a will is effective to transfer from one beneficiary to another insurance money the direction of which had already been declared by the contract of insurance. We are clear that under no ordinary circumstances should such clause be accorded such effect, for the reason that, standing alone, it evinces no such intention in the testator. Such moneys, payable by the insurance contract to designated individuals, can in no proper sense be said to be any part of the estate of the testator. True, the contract of insurance, while he is alive and so far as it has any value, may be said to be his; but that contract, at least in the case of benefit societies such as here presented, can hardly be said to constitute property. It is not a promise in any event to pay to the member. It does not present the situation of the ordinary insurance policy, where the payment of premiums year after year in excess of the insurance risk has built up a fund to which the assured might be entitled upon surrender of the policy. In its essence, it is simply an agreement on the part of the association that under certain circumstances money shall be paid to some one other than the assured, and at the utmost confers upon him a power of designation or appointment which gives him no title, ownership, or property in the fund agreed to be paid after his death. Bacon, Benefit Societies, § 237. This power of appointment is the only form of property which exists during his life, and in that the beneficiary has no vested interest. *McGowan v. Supreme Court I. O. F.* 104 Wis. 173; *Supreme Conclave R. A. v. Cappella,* 41 Fed. Rep. 1. Upon death of the assured that form of property ceases to exist, and there comes into existence a new property, to wit, a debt owed by the association, in which the beneficiary has vested rights and which never was the property of the assured. *Dietrich v. Madison R. Asso.* 45 Wis. 79; *Wendt v. Iowa Legion of Honor,* 72 Iowa, 682; *Holland*

*v. Taylor*, 111 Ind. 121; Bacon, Benefit Societies, § 237; *Greeno v. Greeno*, 23 Hun, 478; *Hellenberg v. District No. 1 I. O. B. B.* 94 N. Y. 580; *Maryland M. B. Soc. I. O. R. M. v. Clendinen*, 44 Md. 429. The great weight of authority, as of reason, is against the inference of any intent to change the already designated beneficiaries of life insurance by a mere residuary clause in a will, and we are convinced that no such purpose can be ascribed to the will of Thomas Hutson.

Thus we reach the conclusion that, except for the slight discrepancy as to amount, the trial court was correct in its view that the proceeds of all the insurance in question did come to the possession and control of Martha Hutson as guardian, and for its safe care and lawful application she was responsible, and her responsibility was guaranteed by the sureties upon her bond, the defendants in this action.

But it is contended by the appellants that credit should be given for support furnished these minor children by their mother and guardian during the year and a half of her life after her husband's death, to wit, from November, 1893, until May, 1895. The propriety of the allowance to a widowed mother, whether she be or be not guardian, for reasonable expenses incurred by her in the support of her minor children, out of their estate, need not be impugned or questioned. She has the unquestioned right, if she chooses, to support those children voluntarily and out of her own means; and, if she so elects, it lies not in the mouth of any one else to complain. *Taylor v. Hill*, 86 Wis. 99. In the record before us we find that at the end of the first year of guardianship, in filing her so-called inventory and report, Mrs. Hutson placed upon the records of the county court her declaration as follows: " All of said minor heirs are living with said guardian, and she will make no charge at this time on account of expenses, such as board and clothing, for any of them." After this declaration that situation con-

tinued for only another six months. We can place no other construction upon these words than that of an exercise of the mother's option to support her children out of her own funds,— an option from which she might doubtless have expressly receded at a future date, and by application to the court have been authorized to pay reasonable expenses out of the guardianship estate in her hands, but from which she never did expressly recede. Under the authority of *Taylor v. Hill, supra,* we cannot say that at the time of her death she could have successfully demanded, as a right, credit for the support of the children. We cannot accord to her sureties a right which she did not have.

Doubtless, after receiving her ward's money, the guardian might have discharged her liability by a safe and legitimate investment of the guardianship funds upon proper security. She did in fact ostensibly invest it in a loan to herself, by issuing to each of her wards her own promissory note for the full amount of the insurance money, and securing all of said notes by a third mortgage upon certain real estate, which is quite conclusively established to have been wholly inadequate as security. We cannot view this as an investment at all. Guardians must not confuse their trust capacity and their personal capacity in dealing with trust funds. No matter how good might have been the security given by the guardian upon the borrowing of guardianship funds from herself, it cannot serve as a credit further than moneys are actually realized therefrom. *In re Taylor Orphan Asylum,* 36 Wis. 534, 552; *Gillett v. Gillett,* 9 Wis. 194; *Cook v. Berlin W. M. Co.* 43 Wis. 433; *O'Dell v. Rogers,* 44 Wis. 136, 179; *Haywood v. Lincoln L. Co.* 64 Wis. 639, 647. The rule of these cases is that no dealing by one in fiduciary capacity with himself individually can prejudicially change the situation of the beneficiaries or their property. The application of this rule is not dependent upon the existence either of fraud or mismanagement; for its

foundation is in a sound public policy, which would exclude all necessity of investigation of either the honesty or the wisdom of such dealings in a dual capacity. Selfish instincts of human kind are so persistent that such dealings are fraught with peril to the fiduciary interests, and safety demands that the rule be absolute. The moneys in Mrs. Hutson's control as guardian were in no wise changed by this ostensible borrowing of them. They remained, as before, a liability against her in that capacity. The trial court was clearly correct in refusing to treat this transaction as in any respect a credit to the guardian as an investment of the guardianship funds. However, in the care and protection both of the minors and of the sureties, the mortgage may well be treated as an application by Mrs. Hutson of so much of her own property to the reimbursement of the moneys improperly diverted from her wards. As against her and as against her general creditors, whatever might in fact be realized out of such security to the wards should, of course, be applied to diminish their loss and the burden to be imposed upon the sureties. The sureties have the right to insist on such application and their exoneration *pro tanto.*

It appears that after Mrs. Hutson's death Charles L. Burnham was appointed guardian and received into his custody the promissory notes and mortgage given by Mrs. Hutson as above described, and received actual payment of two years' interest thereon, amounting to about $195 in behalf of each ward, and that he also received, as the result of pledging the notes and mortgage, the sum of $2,000; that he disbursed that $2,000 for legitimate expenses in support of the three plaintiffs while minors, to wit, between May, 1895, and the latter part of 1897, except about the sum of $300, which was in his custody and possession at a time when he absconded. That unexpended balance of $300 has been demanded by plaintiffs' guardian, and settled and

Hutson and others vs. Jenson and another.

paid by Burnham's sureties, of whom the defendant *Jenson* was one, and has been received, $100 of it by the plaintiff *John F. Hutson* since coming of age, and the other $200 by the present guardian of the two minor plaintiffs, in satisfaction of Burnham's account, under the sanction of the county court. As to the two years' interest which Burnham, as guardian, received from this mortgage, the trial court allowed due credit in favor of the defendants, upon the theory, doubtless, that, so far as the wards actually received money from this security, they in effect received reimbursement of their moneys which had been in the hands of their mother; but he overlooked the fact that they had equally received the $2,000 advanced to them upon pledge of these securities. That money had gone to them as completely and effectively as if their mother had paid it over to a successor in guardianship. No reason is apparent why these sureties should be held to pay a second time an amount which the wards have thus actually received. We need not here consider the authority of *Burnham* as guardian to pledge these securities. That is immaterial to the question whether these wards shall again recover from the defendant sureties what they have already received upon their guardian's liability. *John F. Hutson*, after majority, has insisted that the proceeds of that pledging are his, has held his guardian to account for them, and made settlement with defendant *Jenson* as Burnham's surety on that basis. Not less conclusive and unambiguous has been the conduct of the general guardian of the two minor plaintiffs in asserting ownership of their shares of the proceeds of this disposal of their mother's mortgage, and that, too, under the order of the county court in charge of those estates. The three plaintiffs have received out of the moneys which passed into their mother's hands as guardian $2,000, for which the judgment in this case gives them a second recovery against these defendant sureties. In that respect it is erroneous and must

be corrected  This amount was received July 1, 1897, and
should be applied first to the one instalment of interest
which became due from Mrs. Hutson as guardian on April
1, 1897, as the court finds.  That interest is $288.84, and
leaves $1,711.16 applicable to the principal of her indebted-
ness, and which should therefore draw interest to the date
of the judgment.  The excessive charge to the guardian of
$285.69 on Bankers' Life Association payment, discussed
previously, should draw interest from April 1, 1894, since
the judgment rendered allows interest on the whole sum
charged from that date.  Upon this basis there must be de-
ducted from the total judgment, as of its date, June 22, 1900,
$2,697.85, apportioned $874.09 from the judgment in favor
of *Roy J. Hutson* and $911.88 from the judgment in favor
of each of the other plaintiffs.

*By the Court.*— The judgment appealed from is modified
by substituting $2,993.50 in place of $5,691.35, where that
amount occurs in the second paragraph; also by substituting
$1,016.34 in place of $1,928.22 at each of the two places
where the last amount occurs in said second paragraph; and
also by substituting $960.82 in place of $1,834.91, where that
amount occurs in said second paragraph.  As so modified
the judgment is affirmed, appellants to recover costs in this
court.