STATE of Wisconsin, Plaintiff-Respondent,

v.

Sharon BENO, Defendant-Appellant, Speaker of the Assembly Ed JACKAMONIS, and Richard White, administrative assistant, Intervening Respondents-Petitioners.

Supreme Court

*No. 82–387. Argued October 4, 1983.—Decided January 4, 1984.*

(Also reported in 341 N.W.2d 668.)

124

For the petitioners there were briefs by *Jon P. Axelrod, Douglas L. Flygt* and *DeWitt, Sundby, Huggett & Schumacher, S.C.,* Madison, and oral argument by *Mr. Axelrod.*

For the plaintiff-respondent the cause was argued by *Alan Lee,* assistant attorney general, with *Bronson C. La Follette,* attorney general, on the briefs.

For the defendant-appellant there was a brief by *Charles W. Giesen, Morris D. Berman* and *Eisenberg, Giesen, Ewers & Hayes, S.C.,* Madison, and oral argument by *Charles W. Giesen.*

SHIRLEY S. ABRAHAMSON, J.  This is a review of a published decision of the court of appeals, *State v. Beno,* 110 Wis. 40, 327 N.W.2d 712 (Ct. App. 1982) *(Beno II),* vacating a writ of attachment issued by the circuit court for Dane county, Angela B. Bartell, circuit

judge, confining defendant Sharon Beno in Dane county jail until she has testified and produced documents in accordance with a subpoena issued by the Wisconsin Department of Revenue. Execution of the writ was stayed pending appeal.

The issue on review is whether the circuit court erred in quashing defendant's subpoena directed to Richard White, an administrative assistant to then Assembly Speaker Ed Jackamonis, on grounds of legislative privilege. Holding that White had no legislative privilege,[1] the court of appeals reversed the order of the circuit court quashing the subpoena to White, vacated the writ of attachment against the defendant, and remanded the case for further discovery. We reverse the decision of the court of appeals and affirm the orders of the circuit court.

## I.

The facts of the case are not disputed and are set forth in two previously published court of appeals decisions: *State v. Beno,* 99 Wis. 2d 77, 298 N.W.2d 405 (Ct. App. 1980) *(Beno I),* and *State v. Beno,* 110 Wis. 2d 40, 327 N.W.2d 712 (Ct. App. 1982) *(Beno II).*

Briefly stated, the significant facts on this appeal are as follows: In May 1977 the Wisconsin Department of Revenue began an audit of the tax returns of Delbert Beno, a lobbyist during the Wisconsin state legislative session. The defendant, Sharon Beno, is the wife of Delbert Beno.[2] The audit was referred to the Intelligence

---

[1] The court of appeals granted the motion of the speaker and White to intervene as respondents in the appeal.

[2] The department explains that for purposes of its argument it views Sharon Beno as a taxpayer subject to the investigation. The department's brief states:

"Although the Department is investigating the tax returns of Del Beno, not Sharon Beno the defendant in this case, the state

Section of the department, and in 1978 the department served a subpoena duces tecum on the defendant ordering her to appear and to produce certain financial records. The defendant refused to comply with the subpoena, and the department commenced action in the circuit court to compel compliance. Secs. 71.11(20)(b), 73.04(1)(3), 885.01(4), Stats. 1981–82. Relying on *United States v. LaSalle National Bank*, 437 U.S. 298 (1978), the defendant moved that the subpoena be quashed on the grounds that the department was using its subpoena powers for the improper purpose of gathering evidence for a criminal prosecution. The circuit court, also looking to federal authority, refused to quash the department's subpoena. Concluding that the *LaSalle* case was applicable, the court of appeals held in *Beno I* that the circuit court correctly determined that abandonment of civil tax liability had not occurred but remanded the case for further discovery consistent with *United States v. Genser*, 595 F.2d 146 (3d Cir. 1979), *cert. denied*, 444 U.S. 928 (1979).

is assuming for purposes of this argument that any back taxes, penalties and interest would be paid from joint assets if the Department ultimately determined that taxes were owed and that determination was upheld. Likewise, the state is assuming potential joint criminal liability because both husband and wife signed the return. Of course, at this preliminary stage of the investigation there has been no determination that taxes are owed, much less any determination of criminal liability. Because the defendant in this case is potentially liable for civil assessment and penalties and at least theoretically subject to criminal penalties, the state has not challenged Sharon Beno's standing to raise the issue of the civil/criminal purpose of the subpoena. It should be noted, however, that all of the federal cases discuss the discovery rights of the taxpayer who is under investigation. Ordinarily, the civil or criminal purpose of the subpoena would not be raised, and the state submits could not be raised, in a subpoena directed to a person who is not the subject of the administrative investigation." Reply brief of Plaintiff-Respondent, p. 5, n. 1.

After *Beno I,* the defendant was notified that at a settlement conference in another case Richard White stated that Delbert Beno was about to be indicted on charges of tax fraud. The settlement conference related to a suit brought by then Representative Walter Ward's secretary against Ward and the entire state assembly. Richard White attended this conference on behalf of Ed Jackamonis, Speaker of the Assembly. Apparently there was discussion at this conference about Delbert Beno being called as a witness in the suit. White allegedly stated at the conference something to the effect that Delbert Beno would not be a credible witness since he was about to be indicted on tax fraud.

Planning to use information to be derived from White as evidence of the department's institutional bad faith, the defendant's attorneys subpoenaed White to appear for a deposition. White and Speaker Jackamonis appeared specially and moved the circuit court to quash the subpoena issued to White claiming a legislative privilege under article IV, section 15 (legislator not subject to civil process), and article IV, section 16 (legislator not liable for words spoken in debate), of the Wisconsin Constitution; a legislative privilege under the common law; and a statutory privilege under sec. 905.10(1), Stats. 1981–82 (nondisclosure of identity of informer). To assist the circuit court in determining the nature of the discovery sought, counsel agreed that the defendant could submit written interrogatories to White in lieu of oral testimony. The defendant sought to learn any information White had about the tax liability or tax investigation of Delbert or Sharon Beno and the identity of White's informant.

The affidavits of the speaker and White filed with the circuit court state that Ed Jackamonis, as Co-chair of the Joint Committee on Legislative Organization (JCLO), Chairperson of the Assembly Organization, and Speaker

of the Assembly, had begun an investigation into allegations of misconduct and violations of law by a legislator (not named) and a staff employee pursuant to sec. 13.905, Stats., 1981–82; that as part of the investigation, Speaker Jackamonis directed Administrative Assistant White to interview witnesses and compile information concerning such alleged misconduct for use by JCLO; that while acting within the scope of his responsibilities as a legislative aide conducting this investigation White had received information from an informant concerning the allegations of misconduct in return for a promise that the informant's identity would not be disclosed; and that answering the interrogatories fully and accurately would require disclosure of both the substance and the source of the information given by the informant.

The state moved the circuit court to quash the defendant's subpoena to White on the ground that it exceeded the scope of permissible discovery under *Beno I*. The circuit court held an evidentiary hearing; the testimony viewed most favorably to the defendant indicated that White may have said that Department of Revenue agents told him that Delbert Beno was about to be indicted on tax fraud.[3]

On December 28, the circuit court, ruling from the bench, reaffirmed its earlier decision of August 27, 1981, holding that White was protected by a constitutional legislative privilege and that the privilege had not been waived. The circuit court also held that the department had not abandoned a civil tax purpose and granted the state's request for a writ of attachment against the defendant who continued to refuse to produce the subpoenaed documents. As we stated previously, in *Beno II* the court of appeals held that White had no legislative

[3] The witnesses gave conflicting accounts of what, if anything, White stated regarding Delbert Beno's tax difficulties and how White may have come upon this information.

privilege and reversed the circuit court's order quashing the subpoena issued to defendant White.

## II.

The department contends that this court need not reach the issue of legislative privilege since the testimony sought from White exceeds the permissible scope of discovery.

In *Beno I,* the court of appeals analogized the department to the Internal Revenue Service and adopted the United States Supreme Court's reasoning in *United States v. LaSalle National Bank,* 437 U.S. 298 (1978), as to the department's subpoena powers during a tax investigation. In *LaSalle* the Court held that the Internal Revenue Service must issue a subpoena before the Service recommends a criminal prosecution and that the Service must use the subpoena authority in good faith pursuit of authorized purposes. The taxpayer may resist a subpoena upon meeting the "heavy" burdens of demonstrating institutional bad faith, 437 U.S. at 316. Particularly, the taxpayer may demonstrate "institutional bad faith" by proving that the "institutional posture" of the agency was to delay a recommendation of criminal prosecution in order to gather evidence for the department of justice through the use of an administrative subpoena. 437 U.S. at 317.

The federal circuit courts of appeal have had difficulty applying the *LaSalle* rule and have differed over the extent of discovery allowed the taxpayer challenging the subpoena.[4] If the scope of discovery is too restrictive,

---

[4] *See, e.g., United States v. Price,* 655 F.2d 56 (5th Cir. 1981); *United States v. Kis,* 658 F2d 526 (7th Cir. 1981); *United States v. Moon,* 616 F.2d 1043 (8th Cir. 1980); *United States v. Harris,* 628 F.2d 875 (5th Cir 1980); *United States v. O'Henry's Film Works, Inc.,* 598 F.2d 313 (2d Cir. 1979); *United States v. Genser,* 595 F.2d 146 (3d Cir. 1979), *cert. denied,* 444 U.S. 928 (1979);

the defendant's protection against institutional bad faith is illusory and the defendant's right to challenge an administrative subpoena is a meaningless formality. If the scope of discovery is too broad, the department's investigation and the enforcement of the subpoena are unnecessarily and unreasonably delayed.

In *Beno I* the court of appeals applied the guidelines for discovery set forth in *United States v. Genser*, 595 F.2d 146 (3d Cir. 1979), and remanded the case to the circuit court for further discovery. Neither party sought or seeks review of *Beno I*. Consequently the sole issue before us on this review with regard to discovery is the circuit court's and court of appeals' application of the court of appeals' *Beno I* decision.

Under *Genser* a court considering requests for discovery must determine whether the information sought is relevant to the issue in contention and should limit discovery to issues relevant to the validity of the subpoena and the guarantees of *LaSalle*. *See United States v. Genser*, 595 F.2d 146, 152 (3d Cir. 1979), *cert. denied* 444 U.S. 928 (1979); *United States v. Security Bank and Trust Co.*, 661 F.2d 847, 850 (10th Cir. 1981). The court weighs the relevancy against the extent to which disclosure might delay the civil investigation or jeopardize a criminal investigation. The circuit court, apparently following *Beno I*, concluded that the defendant's request for discovery was relevant to uncovering the institutional posture of the department. The court of appeals in

*United States v. Garden State National Bank*, 607 F.2d 61 (3d Cir. 1979); *United States v. McGuirt*, 588 F.2d 419 (4th Cir. 1978), *cert. denied* 444 U.S. 827 (1979); and *United States v. Church of Scientology of Calif.*, 520 F.2d 818 (9th Cir. 1975). *See also* Saltzman, *IRS Practice and Procedure*, par. 13.08 (1981).

A federal statute adopted effective September 4, 1982, may, according to Saltzman, "leave little, if anything, to the improper criminal purpose objection as developed by the Supreme Court." Saltzman, *IRS Practice and Procedure*, 1983 Supp. No. 1, p. S13–15.

*Beno II,* interpreting its prior opinion in *Beno I,* concluded that it had not precluded "discovery from sources outside the department which might shed light on the department's purpose in issuing a subpoena and that the *Genser* guidelines themselves do not limit discovery to particular confines. The *Genser* guidelines were expressly denominated 'minimum.' "

The defendant has established that White's testimony could be relevant in proving institutional bad faith. If White were to testify that persons from the department of revenue had told him that Beno was about to be indicted on tax fraud, this would be some evidence of the "institutional posture" of the agency.[5] We reject the state's argument that the absence of proof in the department's records of an intent to abandon civil tax collection precludes any further inquiry. The defendant should be entitled to show that despite the department's records other evidence shows that there was a decision by the department to delay a recommendation of criminal prosecution in order to gather evidence for prosecution.

To prove relevancy the defendant need not describe each link in a chain of events which leads from White's alleged statement to the department's institutional bad faith. To adopt this view would be to impose " 'an unreasonable circular burden on the taxpayer: the facts that he must show to obtain discovery are only available through discovery.' Note, *The Institutional Bad Faith*

---

[5] Under *LaSalle* the opinion of a single agent cannot establish institutional bad faith. However, since institutions can only articulate a collective decision through the voices of individual officers, we conclude that under certain circumstances an individual agent's statements which characterize an institutional posture, while not alone proving bad faith, may lead to additional evidence, and may contribute to a finding that the civil tax purpose has been abandoned.

*Defense to the Enforcement of IRS Summonses,* 80 Colum. L. Rev. 621, 638 (1980). We will not saddle the taxpayer with this Catch-22." *United States v. Southeast First National Bank of Miami Springs,* 655 F.2d 661 (5th Cir. 1981). Rather, to be relevant the proffered testimony must contribute to a finding of institutional bad faith, or conceivably lead to other relevant evidence.

White's testimony falls within the scope of discovery articulated in *Genser.* The defendant is entitled "at a minimum" to basic information concerning contacts between the department and the department of justice. 595 F.2d at 152. We read the phrase "at a minimum" to permit the exercise of discretion by the trial court, consistent with the letter and spirit of *Genser.* The federal Rules of Civil Procedure (Rule 81) allow the trial court to modify the rules of discovery in an IRS summons enforcement proceeding to effectuate the purposes of the proceeding. 7 (Pt 2) Moore's *Federal Practice,* para. 81.06 (1983). White's alleged statement that Beno was about to be indicted on tax fraud indicated that White might lead to evidence that the department had made a decision to recommend criminal prosecution to the attorney general. Under these circumstances, the defendant should be entitled to seek further information regarding White's statement, provided that White is not entitled to legislative privilege.

On the basis of *Beno I, Beno II,* and this record we are not persuaded by the department's argument that the discovery sought is beyond the scope of discovery articulated in *Genser.*

## III.

The essence of White's defense to the subpoena is that the speaker (and therefore White) is privileged from tes-

tifying under article IV, sections 15 and 16, of the Wisconsin Constitution.

Article IV, section 15, provides, *inter alia,* that members of the legislature are not subject to any civil process during the session of the legislature. It is undisputed that the subpoena was served on White during the session of the legislature. Article IV, section 15, reads as follows:

"Members of the legislature shall in all cases, except treason, felony and breach of the peace, be privileged from arrest; nor shall they be subject to any civil process, during the session of the legislature, nor for fifteen days next before the commencement and after the termination of each session."

Article IV, section 16, provides that a member shall not be liable for words spoken in debate:

"No member of the legislature shall be liable in any civil action, or criminal prosecution whatever, for words spoken in debate."

In interpreting article IV, sections 15 and 16, of the state constitution, we are not bound by the construction given the speech and debate clause (article I, section 6) of the United States Constitution by the United States Supreme Court. Article I, section 6, of the Federal Constitution provides as follows:

"The Senators and representatives . . . shall in all cases, except treason, felony and breach of the peace, be privileged from arrest during their attendance at the session of their respective houses, and in going to and returning from the same; and for any speech or debate in either house, they shall not be questioned in any other place."

Although these federal and state constitutional provisions share a distant and common origin in the English

Parliamentary struggles in the sixteenth and seventeenth centuries, see *Tenney v. Brandhove*, 341 U.S. 367, 372, 375 (1951), in drafting the Wisconsin Constitution the framers sought guidance not merely in the Federal Constitution but also in the common law, the experiences, the tradition, and the values of the people of the territory of Wisconsin. Early in the history of this state, in *The Attorney General ex rel. Bashford v. Barstow*, 4 Wis. 567, 785 [757, 758] (1855), Justice Smith admonished this court to construe its own state constitution to ascertain its true intent and meaning:

"Let us then look to that constitution, adopted by the people of Wisconsin, and endeavor to ascertain its true intent and meaning, the distribution of the powers of government which *it has in fact made,* and the agencies which it has provided, whereby those powers are to be executed. And here, let it be remarked, that our conclusions must be guided and determined, not by theories of speculators upon the science of government, not by the opinion of jurists of other states reasoning upon philosophical abstractions or political postulates, but by the plain, simple, but authoritative and mandatory provisions of our own constitution. We made it ourselves. We are bound to abide by it, until altered, amended or annulled, and we must construe it, and support it, not according to the vague, conjectural hypothesis of volunteer expounders, resident in other states, having no care or interest in the government, and having no knowledge of the constitution of our state, but according to its plain letter and meaning, as the oath-bond of our safety—as the palladium of our rights and liberties—as the vital principle of our social and political organism.

"The people then made this constitution, and adopted it as their primary law. The people of other states made for themselves respectively, constitutions which are construed by their own appropriate functionaries. Let them construe theirs—let us construe, and stand by ours."

See also *Carpenter and Sprague v. The County of Dane,* 9 Wis. 249 [274] (1859).

The government of the State of Wisconsin and the Wisconsin legislature differ from the federal government and Congress. Article I, section 6, of the United States Constitution differs in language from article IV, sections 15 and 16, of the Wisconsin Constitution. While both the federal and state constitutions provide, with certain exceptions, that legislators shall be privileged from arrest, the Wisconsin Constitution provides that the legislators are not subject to any "civil process." While the federal speech or debate clause protects a federal legislator from being "questioned in any other place," "for any speech or debate in either house," article IV, section 16, of the Wisconsin Constitution states that members will not be "liable in any civil action or criminal prosecution, whatever for words spoken in debate." We have previously stated that because of the difference of language between the federal and state constitutions a construction of the federal speech or debate clause provides no "clear implication as to the meaning of the state clause." *State ex rel. Steiger v. Eich,* 86 Wis. 2d 390, 392, 272 N.W.2d 380, 381 (1978).

We consider first the claim of privilege under article IV, section 15, of the Wisconsin Constitution. The defendant asserts that a subpoena to testify is not a "civil process" as that phrase is used in section 15 and that the privileges set forth in section 15 apply only to a legislator, not to an aide.

We have previously articulated the analysis which a court should employ in interpreting provisions of the Wisconsin Constitution. *Busé v. Smith,* 74 Wis. 2d 550, 568, 247 N.W.2d 141 (1976); *Board of Education v. Sinclair,* 65 Wis. 2d 179, 222 N.W.2d 143 (1974). We have said that the court will examine:

"(1) The plain meaning of the words in the context used;

"(2) The historical analysis of the constitutional debates and of what practices were in existence in 1848, which the court may reasonably presume were also known to the framers of the 1848 constitution, *see State ex rel. Zimmerman v. Dammann* (1930) 201 Wis. 84, 88, 89, 228 N.W. 593; and *State ex rel. Comstock* [*v. Joint School District,* 65 Wis. 631, 27 N.W. 829 (1886)]; and

"(3) The earliest interpretation of this section by the legislature as manifested in the first law passed following the adoption of the constitution. *Payne v. Racine* (1935), 217 Wis. 550, 259 N.W. 437." *Busé v. Smith,* 74 Wis. 2d 550, 568, 247 N.W.2d 141 (1976).

The court of appeals applied these rules of construction and concluded as follows:

"Civil process" is not defined in the Wisconsin Constitution. Reasonable persons can differ regarding its meaning, as applied to a subpoena. Accordingly, the term is ambiguous and the plain meaning rule does not apply.

"Defendant relies on an analysis of the 1848 constitutional debates. During the debates on the article entitled, 'Legislative,' Mr. Chase moved to strike out the fifteenth section, exempting members from arrest. Mr. Estabrook then moved 'to amend the amendment so as to strike out that part of it which privileged members of the legislature from civil actions.' *Journal of the Convention to Form a Constitution for the State of Wisconsin* at 212 (Tenney, Smith and Holt 1848). Mr. Estabrook's 'amendment to the amendment' was rejected. *Journal* at 212. It is difficult to find significance in Mr. Estabrook's references to 'civil actions' in this context.

"We turn to the practices in existence in 1848 and to the earliest interpretations of this section by the legislature as manifested in the first law passed following adoption of the constitution. Section 1, ch. 87, Rev. Stats. 1849, provided in relevant part:

"The several courts of this state having a seal, are courts of record, and they shall respectively have power:

"1. To issue process of subpoena, requiring the attendance of any witness residing or being in any part of this state, to testify in any matter or cause pending or triable in such courts:

"...

"Section 1, ch. 87, Rev. Stats. 1849, establishes to our satisfaction that the first legislature following the adoption of the constitution assumed that the issuance of a subpoena was a type of civil process. We recognize that sec. 1, ch. 87, Rev. Stats. 1849, is not literally a construction of art. IV, sec. 15 within the meaning of *Buse, supra.* However, because the Revised Statutes of 1849 are the first of our statutes to be enacted following the constitution, it is reasonable to rely on those statutes as reflecting the practice when the constitution was adopted to assist our interpretation of a word used by the authors of the constitution in 1848.

"Accordingly, we conclude that a legislator is immunized by art. IV, sec. 15 of the Wisconsin Constitution from being subpoenaed during and fifteen days before and after a session of the legislature." 110 Wis. 2d at 48–49.

We have reviewed the court of appeals' application of the *Sinclair and Busé* rules of constitutional interpretation to the present case, and its research and analysis, and we conclude, as did the court of appeals, that the constitutional phrase "civil process" includes a subpoena. 110 Wis. 2d at 48–49.

The next question is whether the privilege granted by section 15 to a member of the legislature may be invoked by the member on behalf of an aide. We agree with the approach taken by the court of appeals: when the *Sinclair* and *Busé* rules of constitutional interpretation do not provide an answer, the meaning of a constitutional provision may be determined by looking at the objectives of the framers in adopting the provision. We conclude, as did the court of appeals, that the rationale for the privilege was to preserve the public's right to representation in the state legislature during the session of the legislature. When a legislator cannot appear the people whom the legislator represents lose their voice in debate

and vote. *Cf. Doty v. Strong,* 1 Pin. 84 (1840) (interpreting article I, section 6, U.S. Constitution) ; *Anderson v. Roundtree,* 1 Pin. 115 (1841) (interpreting common law and Statutes of the Territory of Wisconsin, 1839, at 157). To accomplish this purpose of the privilege it is not necessary that a legislator be allowed to claim the privilege if his or her aide is subpoenaed. While a subpoena to testify directed at an aide may temporarily reduce the efficiency of a legislator's office, it will not prevent a legislator from voting or participating in legislative activities or representing the constituents. The absence of an aide may be an inconvenience, but the legislator can still continue to represent his or her constituents. Accordingly we conclude, as did the court of appeals, that the privilege exempting a legislator from civil process under article IV, section 15, of the Wisconsin Constitution can be invoked by the legislator, only if the legislator is subpoenaed, not if the aide is subpoenaed.

Having concluded that White is subject to a subpoena under article IV, section 15, we next consider the claim of privilege under article IV, section 16, of the Wisconsin Constitution, which provides that "no member of the legislature shall be liable in any civil action, or criminal prosecution whatever, for words spoken in debate." The defendant argues that section 16 is not applicable in this case for three reasons: first, neither White nor the speaker is a party to the suit and neither White nor the speaker is "liable in any civil action or criminal prosecution whatever"; second, the words about which White is being asked to testify were not "words spoken in debate"; and third, the subpoena is not directed to a "member of the legislature" but to an aide.

Following the rules of *Sinclair* and *Busé* we look for the nineteenth century plain meaning of the phrase "liable in any civil action," which is not defined in the constitution. According to the *Imperial Dictionary*

(London, 1878), "liable" means "1. Bound; obliged in law or equity; responsible; answerable. 2. Subject; obnoxious; exposed." Thus the words "liable in any civil action" could be interpreted to mean answerable as a party to a civil action or answerable to obey a court process such as a subpoena, whether or not the legislator is a party to the civil action.

To help clarify the meaning of section 16 we look to the constitutional debates. The original version of section 16 provides that "no words spoken in debate in either house of the legislature, shall be the foundation of any action, complaint, or prosecution whatever." *Journal of the Convention to Form a Constitution for the State of Wisconsin* at 118 (Tenney, Smith, and Holt, 1848). The amendment to reword the section as it is presently written was proposed by a member of the Committee on Revision and Arrangement. This member's report to the convention included the following remarks concerning the proposed amendments:

"The committee in discharging their duty had examined the several articles with scrupulous care, and had suggested several verbal amendments, in which they had varied the phraseology by selecting such words as conveyed the meaning most fully, and as were most generally used in constitutional law. They had also made some grammatical and orthographical corrections, but in no case changed the meaning or sense." *Journal* at 454.

Since the draftsmen considered the phrase "foundation of any action, complaint, or prosecution whatever" to be synonymous with the phrase ultimately adopted, we may find a further clue to the framers' intent in the nineteenth century meaning of the words "foundation," "action," "complaint," or "prosecution." The *Imperial Dictionary* defines *foundation* as "the basis or groundwork of any thing; that on which any thing stands, and by which it is supported"; *action* as "(in law) literally,

an urging for a right; a suit or process, by which a demand is made of a right; a claim made before a tribunal"; *complaint* as "accusation; charge against an offender"; *prosecution* as "the institution and carrying on of a suit in a court of law or equity, to obtain some right, or to redress and punish some wrong." The *Imperial Dictionary* defines *subpoena* as a "writ by which common persons are called into chancery, in cases where the common law has provided a remedy." The word "subpoena" literally translated means "under penalty" and referred to the monetary penalty imposed for failure to comply with the writ. After looking at the original phraseology "foundation of any . . . prosecution" and the plain meaning of the words, we conclude that this phraseology can also be interpreted to refer either to substantive liability or to both substantive liability and liability to court process.

For resolution of the meaning of section 16, we consider the objectives the framers sought to achieve. The framers' objectives in adopting section 16 were to ensure the independence of the legislature and the integrity of the legislative process by precluding the possibility of intimidation or harassment of members of the legislature. In the English parliamentary struggles the privilege was initially viewed as a protection of members of Parliament against action by the Crown. The privilege was expanded over the years to protect legislators against harassment by the executive or individuals and to foreclose accountability of the legislator before a possibly hostile judiciary. Yankwich, *The Immunity of Congressional Speech—Its Origin, Meaning and Scope,* 99 U. Pa. L. Rev. 960 (1951). Section 16 thus reinforces the separation of powers doctrine, protecting the independent functioning of the legislative branch by preventing interference, intrusion, or intimidation by the other branches. The framers' judgment was that the courts are not the proper place to hold

legislators accountable as elected representatives for "words spoken in debate."

The objectives of section 16 are implicated not only when the legislator is a defendant in a civil suit for damages or in a criminal prosecution but also when the legislator is called as a witness to testify. Although compelling testimony is probably not as coercive as charging the legislator with liability for a civil wrong or criminal offense, intimidation and harassment of a legislator may still result from the threat of a subpoena to testify. Requiring a legislator to submit to the burden of testifying about "words spoken in debate" might chill the ardor of a member to speak and act freely in the performance of legislative functions.

We conclude that interpreting section 16 to protect the legislator not only from adverse judgments but also from questioning in a judicial proceeding comports with the objective of the section, and we so interpret section 16.

The second question raised by the defendant as to the applicability of section 16 to this case is whether the activities of the speaker fall within the sphere of legislative functions to which section 16 is applicable. Not all of the legislator's activities fall within the protection of section 16. The privilege granted a legislator by section 16 is not unlimited. The constitution literally protects the member from liability for "words spoken in debate." The clause thus focuses upon matters occurring in legislative deliberations. Neither section 16 nor the separation of powers doctrine bars the court from ever exercising jurisdiction over a legislator. The principle accorded legislators by section 16 exists only to the extent necessary for the adequate functioning of the state legislative body. The court's task of defining the bounds of the legislative privilege is difficult. The court must ensure that legislative privileges are broad enough to protect the

integrity of the legislative process, but not so broad as to endow a legislator with unlimited absolute personal immunity from substantive liability or from any obligation to testify in a judicial proceeding. Judicial action may be needed to serve broad public interests, as when the court acts not in derogation of the separation of powers but to maintain the proper checks and balances or to vindicate the public interest.[6]

Because substantive immunity and a privilege not to testify are exceptions to the time-honored rules that all persons are liable for the wrongs they commit and all persons must testify in judicial proceedings,[7] section 16 should be construed to extend only so far as is necessary to achieve its objective of protecting the integrity of the legislative process. Nevertheless, considering the purposes of section 16, we do not read section 16 as limited to words spoken on the floor of the Assembly or Senate in debate. We read section 16 to reach matters that are an integral part of the processes by which members of the legislature participate with respect to the consideration of proposed legislation or with respect to other matters which are within the regular course of the legisla-

---

[6] We are not concerned in this case with the situation in which the legislator has committed a criminal or unconstitutional act in the course of legislative duties, or a case in which the disclosure of words or acts within the scope of legitimate legislative functions is sought in a criminal case. These issues, as well as many others, are not now before the court.

[7] As we stated in *State v. Gilbert*, 109 Wis. 2d 501, 505, 326 N.W.2d 744 (1982):

"The well-accepted legal principle, a fundamental tenet of our modern legal system, is that the public has a right to every person's evidence except for those persons protected by a constitutional, common-law, or statutory privilege. This principle applies to all of us—even to the President of the United States. *United States v. Nixon*, 418 U.S. 683 (1974); *United States v. Fromme*, 405 F. Supp. 578 (E.D. Cal. 1975)."

tive process. In the landmark case *Coffin v. Coffin*, 4 Mass 1, 27 (1808), interpreting constitutional language which was substantially similar to the original draft of section 16, the court concluded that the constitutional protection extended beyond debate. The court said:

"These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal. I therefore think that the article ought not to be construed strictly, but liberally, that the full design of it may be answered. I will not confine it to delivering an opinion, uttering a speech, or haranguing in debate; but will extend it to the giving of a vote, to the making of a written report, and to every other act resulting from the nature, and in the execution, of the office. . . ."

We conclude that the sphere of legislative action deserving of protection under section 16 is broader than the actual deliberations on the floors of the houses but to be protected the legislative activity must be related closely to the purposes justifying the protection.

The question remains then whether in this case the speaker's activities about which the defendant sought to question White fall within section 16. The speaker's affidavit asserts that he is chairperson of the Assembly Organization Committee and co-chairperson of the Joint Committee on Legislative Organization which is authorized to "inquire into alleged misconduct by members or employees of the legislature." Sec. 13.905, Stats. 1981–82. The speaker asserts that in his legislative capacity he directed White, whose duties include providing assistance to the speaker in his capacity as chairperson and co-chairperson of the respective committees, to investigate allegations of a legislator's misconduct to con-

sider whether discipline was warranted. The speaker viewed the investigation as part of his duties under article IV, section 8, of the Wisconsin Constitution and sec. 13.905, Stats. 1981–82. Article IV, section 8, provides, "each house may determine the rules of its own proceedings, punish for contempt and disorderly behavior, and with the concurrence of two-thirds of all the members elected, expel a member; but no member shall be expelled a second time for the same cause."

The affidavits of White and the speaker state that in the course of conducting the investigation, White was given information by an unnamed person in exchange for a promise of confidentiality. The record indicates that Delbert Beno could have had relevant information concerning any investigation involving Representative Ward. Therefore, facts regarding the background and credibility of Delbert Beno could reasonably have come to White's attention in the course of his investigation of a legislator's misconduct. It is this information that the defendant seeks to learn. Since an investigation for the purposes of determining the discipline of a member is within the regular course of the legislative process, and because the information which White allegedly received could have reasonably occurred in the course of this investigation, we conclude that any conversations between White and his sources regarding Delbert Beno's tax liability would be within the sphere of the speaker's legislative functions protected by section 16.

The third issue raised by the defendant as to the applicability of section 16 to this case is whether a member of the legislature can invoke his or her privilege under section 16 when the aide, not the legislator, is the person subpoenaed. The privilege established by the constitution belongs, according to the words of section 16, to the member of the legislature. Nevertheless, the framers' objectives in granting the legislator the privilege of not being

compelled to testify may be implicated when the legislator's personal aide is subpoenaed to testify.

We recognize that the complexities of the modern legislative process have increased legislators' reliance upon the assistance of employees. It is an aide's relationship with a particular member of the legislature, not the mere fact of employment, that makes it a realistic possibility that questioning of the aide in a judicial forum might have an inhibiting effect upon the member's performance and might infringe upon the member's legislative independence. When the aide is acting as the member's alter ego in carrying out an activity which falls within the scope of section 16, the purposes of section 16 will be served if the aide and the member are treated as one under section 16 and the member is allowed to assert his or her privilege to prohibit the questioning of an aide. An opposite conclusion would compel the legislator to perform all legislative tasks personally to secure the protection of section 16.

The privilege of not being compelled to testify is the legislator's not the aide's, and only the legislator may invoke the privilege. If an aide is subpoenaed to testify, the aide has no privilege under section 16 not to testify unless the member of the legislature approves the aide's assertion of the privilege. To assert the privilege under section 16 to protect the aide from being compelled to testify, the member must demonstrate that the aide was in fact acting at the member's request and that the act about which the aide will be questioned falls within the scope of legislative functions protected under section 16 if performed personally by the legislator. The member must thus formally and publicly take personal responsibility for the aide's activity.

In this case the speaker invoked his privilege under section 16 asserting that White did act as his alter ego,

and we have concluded that the speaker—through White —was acting within the sphere of protected legislative functions. Accordingly we conclude that the subpoena to the aide is tantamount to a subpoena to the speaker and should be quashed.

Finally, the defendant asserts that the privilege under section 16 was waived when White divulged information about Delbert Beno. The defendant reasons that disclosure of the substance of the confidential matter waives the privilege. The defendant's reasoning is erroneous, because the legislative privilege under section 16, unlike other privileges set forth in ch. 905, Stats. 1981–82, is not based solely on the need to preserve confidentiality of communications. The legislative privilege is designed to prevent questioning of a legislator even if the substance of the matter is public information. The speaker asserted the legislative privilege immediately upon receipt of the subpoenas and continually asserted the privilege thereafter. Under these circumstances it is clear that the privilege was not waived.[8]

*By the Court.*—The decision of the court of appeals is reversed.

LOUIS J. CECI, J. (dissenting). I respectfully disagree with the conclusion of the majority only as it relates to immunity for legislative aides under art. IV, sec. 16. Dean Wigmore has stated the following proposition concerning privileges from testifying:

"For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary

---

[8] In view of our holding we need not consider the question of a legislative privilege under common law or sec. 905.10(1), Stats. 1981–82.

assumption that there is a general duty to give what testimony one is capable of giving and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule." 8 Wigmore, *Evidence,* sec. 2191 (McNaughton rev. 1961).

The Supreme Court has cited this maxim with approval. *United States v. Bryan,* 339 U.S. 323, 331 (1950).

The reasons behind this maxim are well-founded. Dean Wigmore has characterized the duty as a contribution which must be made by the individual to society in order that the execution of justice is ensured. He has also stated that this demand for the individual's contribution is made by the community as a whole, to protect the continuance of the judicial process and ultimately to achieve a state of law and order which civilized society requires. Therefore, any privileges of exemption from the duty to testify must be treated as exceptional and should be approached with caution. "They should be recognized only within the narrowest limits required by principle. Every step beyond these limits helps to provide, without any real necessity, an obstacle to the administration of justice." 8 Wigmore, *Evidence* sec. 2192. One must always bear in mind that the very foundation of the legal system is the doctrine of full disclosure.

This court has striven to abide by this maxim, stating in a recent case that the duty to testify extends to all citizens, including the President of the United States, and that the courts will only excuse persons from the duty in the most extreme situations, such as when a young child's emotional well-being is threatened should she be compelled to testify. *State v. Gilbert,* 109 Wis. 2d 501, 504–08, 326 N.W.2d 744 (1982).

In this decision, however, the majority seemingly has brushed over this maxim. The majority states that art. IV, sec. 16 may be utilized to protect a legislative aide from being compelled to testify after a member of the

legislature has approved the aide's assertion of the privilege. The aide may assert the privilege even though the disputed statement imparted information which would have been outside the realm of information normally communicated by an aide on behalf of the legislator.[1] This is also notwithstanding the fact that the plain language of sec. 16 provides that *"[n]o member* of the legislature shall be liable"* and does not contain any references to persons other than members of the legislature.

I do not take issue with the majority's general reasoning concerning the legislator's increased dependence on the aide because of the complexities of the modern legislative process. However, I do take issue with the majority's interpretation of sec. 16 in order to extend the privilege to the aide, especially when one considers the fact that the statement did not relate to the aide's duties for the legislator. Clearly, this is stepping beyond the narrowest limits which privileges must be accorded. Also, it opens the door to future claims that a person who is protected by an *express* statutory, common law, or constitutional privilege requires another's assistance in order to carry out that person's duties in society. The court has created an entirely new class of persons exempt from the duty to testify, and there is no clear limit to the potential parameters of this class.

---

[1] The record indicates that Attorney Sarah Crandall attended a statutorily required conciliation conference in a sex discrimination action filed by Walter Ward's former secretary against Walter Ward and the entire Wisconsin Assembly. Attorney Crandall represented Ward's secretary. Richard White was present as Ed Jackamonis' Administrative Assistant, who, as Speaker of the Assembly, was involved in the lawsuit. Attorney Crandall testified that Richard White made statements concerning her client's claim, stating that it had come to his attention that Del Beno, a witness in the case, was about to be indicted on tax fraud. White stated that he, therefore, felt that Del Beno would not be a credible witness.

I believe that a maxim rooted in three hundred years of judicial evolution should not be brushed aside in order to make the legislator's duties more convenient. As the Supreme Court stated in *United States v. Nixon,* "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."[2]  Accordingly, I dissent.

[2] *United States v. Nixon,* 418 U.S. 683, 710 (1974).